**SIERRA CLUB, a non-profit California Corporation, et al., Plaintiffs,**

**v.**

**Rogers C. B. MORTON, as Secretary of the Interior of the United States, et al., Defendants.**

**No. C-71-500-CBR.**

United States District Court, N. D. California.

July 28, 1975.

616

John B. Clark, Pettit, Evers & Martin, San Francisco, Cal., for plaintiffs Sierra Club, Friends of the Earth and Hank Schramm.

Michael R. Sherwood, San Francisco, Cal., Sierra Club Legal Defense Fund, for plaintiff Sierra Club.

Gary J. Near, San Francisco, Cal., for plaintiffs Friends of the Earth and William Dixon.

James L. Browning, Jr., U. S. Atty., Francis Boone, Richard J. Dauber, Asst. U. S. Attys., San Francisco, Cal., for federal defendants.

Evelle J. Younger, Atty. Gen., Carl Boronkay, R. H. Connett, Bertram G. Buzzini, Deputy Attys. Gen., Sacramento, Cal., for state defendants.

Victor E. Gleason, Los Angeles, Cal., for intervening defendant Metropolitan Water District of Southern California.

James G. McCain, Corcoran, Cal., for intervening defendant Tulare Lake Basin Storage District.

Albert Thomas Henley, San Jose, Cal., and Daniel F. Gallery, Sacramento, Cal., for intervening defendant Santa Clara Water District.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

In 1971 two environmental groups and two individuals brought this action to contest the allegedly unlawful construction and operation of three major facilities of the California Water Project. The parties agreed to bifurcate the trial of the action into a liability phase and a relief phase. The liability phase was tried to the Court between June 10, 1974, and June 21, 1974. Subsequently, on July 26, 1974, the Court heard oral argument and at the conclusion of that argument informed the parties of its views as are more fully set forth herein.

The California Water Project has been constructed in part as a response to California's water problem. The essence of that problem is the need to redistribute the state's plentiful water supply from water-abundant areas to water-deficient areas. The water-rich areas lie in the North and West Central portion of the state. Water from these areas flows through a system of rivers and channels to the Sacramento-San Joaquin Delta ("Delta") and finally through the San Francisco Bay to the Pacific Ocean. One proposed solution to the state's water problem is transporting the excess water, which would normally flow into the ocean, to the arid or semi-arid areas of the state. A second and interrelated problem arises because the excess water is present in and flows out of the water-rich areas only during certain times of the year. Because the demand for water consumption for human use is relatively constant throughout the year and the agricultural demand varies during different times of the year, water which accumulates in the water-rich areas during the excess water seasons must be stored for use during the year if these demands are to be met.

A brief description of the geographical area underlying the subject matter of this suit will aid in understanding the facts of this case. The Delta is a roughly triangular-shaped region which runs southwest from Sacramento west of the Sacramento River to Antioch, which forms one corner of the triangle. It then runs southeast from Antioch to a point approximately 10½ miles southeast of Tracy, which forms a second corner. Finally, it runs north from that point through Stockton to Sacramento, completing the triangle. Clifton Court Forebay, Delta Pumping Plant, and Tracy Pumping Plant are located on the edge of the Delta approximately half-way between Antioch and Tracy. The proposed route of the Peripheral Canal runs from the intake structure in the north Delta, south through the east Delta, and finally turns to the southwest, stopping between the Tracy Pumping Plant and the Clifton Court Forebay. In the southern Delta the San Joaquin River and its tributaries flow basically in a northwesterly direction while in the northern Delta the Sacramento River and its tributaries flow in a southwesterly direction.[1]

The California Water Project consists of both state and federal facilities. The federal component of the project is administered by the United States Bureau of Reclamation and is designated as the Central Valley Project. The state component of the project is administered by the Department of Water Resources, a department within the Resources Agency of the State of California, and is designated as the State Water Project.

The Central Valley Project, the federal project, consists of a series of reservoirs, pumping plants, canals, and other facilities designed to control the flow of water in the Sacramento River, San Joaquin River, and certain of their tributaries, generate hydroelectric power, provide flood control, and provide water for irrigation and other uses in the Central Valley of California. One of the principal facilities of the Central Valley Project is the Tracy Pumping Plant, located on an inlet channel of Old River in the Delta. The Tracy Pumping Plant diverts water from the Delta by pumping it into the Delta-Mendota Canal, a 115-mile canal which leads to the Mendota Pool in the Central Valley.

The State Water Project, created by the Burns-Porter Act of 1959, was to consist of a system of dams, canals, pumping plants, and other facilities designed to transfer water across the Delta, provide for water conservation and flood and salinity control in the Delta, provide for the generation of power, and provide transfer water from points at or near the Delta to the San Francisco Bay Area, the San Joaquin Valley, the Central Coast, and Southern California. The Burns-Porter Act was submitted to

1. See the map of the Delta attached hereto as Exhibit A.

and approved by California voters on November 8, 1960.

Substantially all of the water required annually by the State Water Project is to be obtained initially from the Sacramento and San Joaquin Rivers and their tributaries. Among the facilities constructed for this purpose are the Delta Pumping Plant and the Clifton Court Forebay which are located on the edge of the Delta. A majority of the water that is transported from Northern California to Southern and Central California travels through the Delta Pumping Plant and the California Aqueduct.

The State of California through its Department of Water Resources has entered into contracts providing that at some point in the future it deliver 4.23 million acre-feet of water annually by means of the State Water Project. The primary purchasers of water are the Kern County Water Agency, which has agreed to purchase 1,153,400 acre-feet annually, and the Metropolitan Water District of Southern California, which has agreed to purchase 2,011,500 acre-feet annually. It is expected that over 95% of the water which the State is contractually obligated to deliver to Central and Southern California will be transmitted through the Delta Pumping Plant.

Many controversies have been associated with the continuing development of this massive water project. This case, however, concerns the extent to which the decisions and actions of state and federal defendants must take into account navigational, environmental, fish, and wildlife considerations. The Delta, consisting of approximately 700 miles of meandering waterways, some of which are navigable, is used for both commercial shipping and recreational boating. Water skiing and houseboating are common activities in this region and there are many marinas within its confines. A significant amount of California warm water fishing, anadromous sport fishing, and approximately 80% of the commercial salmon fishing is depend-

ent upon the environment in the Delta. Moreover, this region and its adjoining marshlands and wetlands are on the Pacific Flyway, an important wintering area and major and customary natural habitat for migratory waterfowl.

Plaintiffs in this case are The Sierra Club, Friends of the Earth, Hank Schramm, and William Dixon. The Sierra Club is a nonprofit California corporation having in excess of 130,000 members of whom more than 40,000 live in the San Francisco Bay and the Sacramento-San Joaquin Delta areas. Included in the membership of the Sierra Club are many persons who use the waters referred to in the complaint for recreational purposes, including, but not limited to, boating, fishing and swimming. The stated purposes of the Sierra Club include the preservation and conservation of the natural resources, fish, and wildlife of the United States, including its rivers, bays, wetlands, deltas, and estuarine areas.

Friends of the Earth is a nonprofit New York corporation which has its principal place of business in San Francisco. Its stated purposes include the preservation, restoration, and rational use of the environment.

Hank Schramm is and has been engaged for the past 20 years in the business of commercial fishing and the operation of sports fishing party boats in the San Francisco Bay and the Pacific Ocean. Schramm has a economic interest in this controversy since he depends for his livelihood on the maintenance, preservation, and conservation of sports and commercial fisheries in the San Francisco Bay and the adjoining waters of the Pacific Ocean.

William Dixon owns substantial property in the Delta, including a partnership interest in the St. Germain Duck Club on Simmcns Island, and consequently has an economic interest in the maintenance, preservation, and conservation of adequate non-polluted supplies of water in the Delta and San Francisco Bay regions.

Defendants are state and federal officials who administer the various agencies responsible for overseeing the operation, construction, and regulation of the facilities in question. The federal defendants are Rogers C. B. Morton, Secretary of the Interior; Gilbert Stamm, Commissioner of the Bureau of Reclamation; Howard H. Calloway, Secretary of the Army; William C. Gribble, Jr., Chief of Engineers of the United States Army; George B. Fink, Division Engineer of the South Pacific Division of the United States Army Corps of Engineers; Colonel Frederick J. Rockwell, District Engineer of the Sacramento, California District of the United States Army Corps of Engineers; and Colonel James L. Lammie, District Engineer for the San Francisco, California District of the United States Army Corps of Engineers. The state defendants are Norman B. Livermore, Jr., Secretary for Resources, and John R. Teerink, Director of the Department of Water Resources.[2]

■ Plaintiffs' amended complaint alleged six claims for relief, namely, failure of defendants to comply with Sections 9 and 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401, 403 (first claim); Section 13 of the Rivers and Harbors Act of 1899, 33 U. S.C. § 407 (second claim); Sections 2 and 3 of the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 662, 663 (third claim); Sections 101 and 102 of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4331, 4332 (fourth claim); the Estuarine Areas Act and the Federal Water Pollution Control Act, 16 U.S.C. § 1221 *et seq.* and 33 U.S.C. § 1151 *et seq.* (fifth claim); and the California Environmental Quality Act, California Public Resources Code § 21000 *et seq.* (sixth claim). In the pretrial order plaintiffs abandoned their second claim. Since the

parties have at best cursorily asserted and argued with respect to the fifth claim, and since plaintiffs have offered neither findings nor conclusions with respect to that claim and none of the trial testimony or exhibits were directed toward that claim, the Court considers the fifth claim to have been abandoned at trial and does not discuss it in this Memorandum of Opinion.

The heart of this phase of the controversy is the legality and operation of the Tracy and Delta Pumping Plants and the proposed construction and operation of the Peripheral Canal.

## I. FACTUAL BACKGROUND

### A. *The Tracy Pumping Plant*

Construction began on the Tracy Pumping Plant ("Tracy Plant") in 1947 and was sufficiently completed by June 11, 1951, so that the facility could commence initial operation. The Tracy Plant was built by the Bureau of Reclamation at a point approximately two miles from the Old River and one mile south of the Clifton Court Tract. While the Tracy Plant was being constructed, an intake channel was simultaneously constructed from the pumping plant northeast to Old River. The Tracy Plant consists of six pumps with a maximum pumping capacity of 4602 cubic feet per second ("cfs") which lift the water supplied through the intake channel into the Delta-Mendota Canal. The Delta-Mendota Canal is the conduit through which federal water is transported to the Central Valley.

### B. *The Delta Pumping Plant*

Construction commenced on the Delta Pumping Plant ("Delta Plant") in July of 1963 and was sufficiently completed by late 1967 so that the Delta Plant

---

2. For the purposes of this Memorandum of Opinion, defendants are named as they appeared in the Agreed Pre-Trial Order. The Court notes that all of the named defendants were sued in their official capacities and thus,

even though some of those originally named no longer occupy those positions, by virtue of Rule 25(d)(1) of the Federal Rules of Civil Procedure their successors are deemed automatically substituted.

could begin diverting Delta water at that time. It was not until February of 1969, however, that all construction was finished. The Delta Plant is approximately two miles southwest of the end of Italian Slough, an inlet off Old River. Originally water exported by the Delta Plant was transported through an intake channel connecting the Delta Plant with Italian Slough. The construction of this intake channel required the State to cut through the levee of the slough. The Delta Plant presently has seven pumping units with a combined capacity of 6300 cfs[3] which lift Delta water into the California Aqueduct. However, there is room for the installation of four additional pumping units which would increase capacity to 10,300 cfs,[4] and it is contemplated that at least the first of these pumps will be operational by 1980.

In order to obtain the ability to confine pumping to off-peak electrical hours, the State acquired the Clifton Court Tract and in December of 1967 commenced construction of the facility which is an artificial body of water known as Clifton Court Forebay. Construction of this Forebay involved the excavation of land and the building of dikes or levees inside the existing levees which shielded Clifton Court Tract from Italian Slough, West Canal, and Old River. When the Forebay became operational in November of 1969, the end of the Italian Slough intake channel was closed, and the remainder of the channel was connected to the Forebay, thus creating the intake channel for the Delta Plant. The Forebay diverts water from the Delta through an intake structure consisting of five radial gates which connects the Forebay to West Canal. West Canal in turn is connected to Old River.

## C. *The Peripheral Canal*

The State of California proposes to finance, construct, and operate a 42-mile canal, known as the Peripheral Canal, from a point near Hood, California, on the Sacramento River to a point near the headworks of Clifton Court Forebay and the intake channel for the Tracy Plant. The Peripheral Canal is designed to permit the State to transport high quality fresh water to the Delta and Tracy Plants by diverting water from a point on the Sacramento River upstream from both the point of salt water intrusion and the point where poorer quality water from the San Joaquin River joins the Sacramento River in order to insure that saline or poorer quality water from the Delta does not enter the pumps of the Delta or Tracy Plants. The Peripheral Canal is designed to provide sufficient quantities of water to the Delta and Tracy Plants so as to satisfy the present and future requirements of the California Water Project, to provide water quality control, and to improve fish and wildlife and recreation potentials in the Delta.

As presently proposed, the Peripheral Canal will be 30 feet deep, have a base width of approximately 200 feet, have a top width of between 400 and 500 feet, and have an anticipated capacity of approximately 23,000 cfs. This maximum capacity would be allocated in the following manner: 10,300 cfs would be allocated to the State Water Project facilities served by the Delta Plant, 6,500 cfs would be available to the Federal Central Valley Project,[5] and 6,000 cfs would be available for release into the Delta along the path of the Peripheral Canal. Although one witness estimated that the entire Peripheral Canal project would cost $240 million, inflationary forces could easily result in a much higher cost.

---

3. Stated in other terms, the Delta Plant currently has the capacity to pump 12,600 acre-feet of water per day.

4. If a pumping plant pumps at the rate of 1 cfs for 24 hours, it will pump 1.98 acre-feet per day.

5. It is not clear from the testimony how much of this figure would be available for pumping through the Tracy Plant.

## II. RIVERS AND HARBORS ACT OF 1899

### A. *Private Right of Action*

In determining whether a private right of action is implicit in a statute not expressly providing one, four factors are relevant: (1) Is the plaintiff one of the class for whose especial benefit the statute was enacted; (2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; (3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff; and (4) Is the cause of action one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law? *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L. Ed.2d 26 (1975). *See Securities Investor Protection Corp. v. Barbour*, 421 U. S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); *National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers*, 414 U.S. 453, 457–458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) (hereafter *Amtrak*). *But cf. Stewart v. Tdavelers Corp.*, 503 F.2d 108, 110–111 n. 7 (9th Cir. 1974). Private rights of action are based on a public policy of allowing injured parties to obtain civil redress for injuries resulting from the violation of statutorily imposed duties where the maintenance of such actions would effectuate the purposes intended to be served by the Act and would not interfere with the operation of the statutory scheme. While the courts that have considered the issue have expressed diverse views,[6] the Court of Appeals in this Circuit has held *sub silentio* that a private right of action exists under Sections 9 and 10. *Alameda Conservation Association v. California*, 437 F.2d 1087, 1094–1095 (9th Cir. 1971); *Sierra Club v. Leslie Salt Co.*, 354 F.Supp. 1099, 1104–1105 (N.D.Cal.1972). In *Alameda Conservation* plaintiffs sought injunctive relief against defendant corporation alleging injury arising out of defendant's violation of Sections 9 and 10. The court, after concluding that all of the individual plaintiffs (but not the association) had standing to sue, reversed the district court's dismissal. Although the court did not explicitly discuss the question of whether a private right of action existed, it would not have reversed the district court's dismissal of the action unless it had so ruled *sub silentio*.[7] Moreover, in *Cort v. Ash, supra*, 95 S.Ct.

---

6. The Court of Appeals for the Third Circuit has held that governmental enforcement is exclusive and that Congress did not create any civil cause of action in favor of private parties injured by any violation of the Act. *Red Star Towing and Transportation Co. v. Department of Transportation*, 423 F.2d 104, 106 (3d Cir. 1970). *See Hooper v. United States*, 331 F.Supp. 1056, 1058 (D.Conn. 1971). *Guthrie v. Alabama By-Products Co.*, 328 F.Supp. 1140, 1148 (N.D.Ala.1971), *aff'd.*, 456 F.2d 1294 (5th Cir. 1972), merely holds that although Section 13 of the Rivers and Harbors Act may create a federally protected right against deposit of refuse which injures navigation or anchorage, the injury of other private rights, even from deposits in violation of Section 13, does not give rise to a federal right of action nor does it supply a basis of federal jurisdiction. The crux of that decision was the court's belief that Section 13 was not enacted for the purpose or with the effect of creating a federal cause of action to protect riparian landowners from the kinds of water pollution that have traditionally been dealt with under the law of nuisance. *Ibid.*, at 1145. There the court simply did not find the plaintiffs within the class of persons for whose benefit the statute was enacted. *Bass Anglers Sportsman's Society v. Scholze Tannery, Inc.*, 329 F.Supp. 339, 348–349 (E.D.Tenn.1971), and *Bass Angler Sportsman Society v. United States Steel Corp.*, 324 F.Supp. 412, 416 (N.D., M.D. and S.D.Ala.), *aff'd., sub nom. Bass Anglers Sportsman Society v. Koppers Co.*, 447 F.2d 1304 (5th Cir. 1971), at best hold that no private right of action exists under Section 13 to redress public injuries. In fact, the Fifth Circuit has held that there exists a private right of action to redress specific injuries. *Neches Canal Co. v. Miller & Vidor Lumber Co.*, 24 F.2d 763, 765 (5th Cir. 1928).

7. Standing concerns whether a particular plaintiff is sufficiently connected with a cause of action to assert rights thereunder in a

2080, the Supreme Court apparently construed *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 201–202, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), as recognizing the existence of a private right of action under the Rivers and Harbors Act of 1899, albeit under a different section of the Act. Finally, analysis of the Rivers and Harbors Act of 1899 in light of *Cort v. Ash* also leads the Court to conclude that a private right of action exists under Sections 9 and 10.

 First, the Court concludes that plaintiffs are members of the class for whose especial benefit the statute was enacted. Sections 9 and 10 were enacted both to prevent injuries to private parties as a result of obstructions to navigable capacity which were not authorized by the United States and to allow the United States to regulate obstructions to the navigable capacity of its navigable waterways.[8]

 Second, the Court concludes that there is no indication that it was the intent of Congress to preclude a private right of action.[9] In reaching this

conclusion, the primary consideration is the significance of the provisions empowering the Attorney General to enforce the Act in appropriate proceedings. Preliminarily, the Court notes that the doctrine of *expressio unius est exclusio alterius*, recently given vitality in two United States Supreme Court decisions, has been held to be inapplicable to the Rivers and Harbors Act of 1899. *Wyandotte Transportation Co. v. United States, supra,* 389 U.S. at 200–204, 88 S.Ct. 379.[10] That being so, the only question is whether there is anything in the Act or the statutory scheme which indicates that Congress intended to vest exclusively in the Attorney General the enforcement of the Act. Section 12, 33 U.S.C. § 406, makes violation of Sections 9 and 10 a misdemeanor punishable by fine or imprisonment and further provides that:

"* * * the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in

legal proceeding. Clearly, before a court can rule on the question of standing, there must be a determination that a private right of action exists. See *Amtrak, supra,* 414 U.S. at 456, 94 S.Ct. 690.

8. Prior to its enactment the Supreme Court in *Willamette Iron Bridge Co. v. Hatch,* 125 U.S. 1, 8, 8 S.Ct. 811, 31 L.Ed. 629 (1888), held that there was no common law of the United States which prohibited obstructions and nuisances in navigable rivers. In that case a *private party* had obtained an injunction against the construction of a bridge over the Willamette River. Because the Court found that there was no federal common law prohibiting such a bridge and that the act admitting Oregon into the Union also did not prohibit such a bridge, it reversed the decision of the trial court and ordered the suit dismissed. It was in response to this case that Congress enacted the Rivers and Harbors Act. This Court believes this is clear evidence that the Rivers and Harbors Act was enacted to benefit those persons who are specifically injured by an unlawful obstruction to navigable capacity.

9. The Court notes that it has not found and the parties have not cited any authorities

which indicate a congressional intent to create a private right of action, with the exception of the above analysis of *Willamette Iron Bridge Co. v. Hatch.*

10. In *Barbour* and *Amtrak* the court adopted the proposition that express statutory provision for one form of proceeding ordinarily implies that no other means of enforcement was intended by the legislature. *Securities Investor Protection Corp. v. Barbour, supra,* 95 S.Ct. 1733; *Amtrak, supra,* 414 U.S. at 458, 94 S.Ct. 690. The court further stated that that implication would yield, however, to clear contrary evidence of legislative intent as found in the legislative history and in the overall structure of the Act. This principle is no barrier in the instant case in view of the holding of the Supreme Court that the remedies specified in the Rivers and Harbors Act of 1899 are not exclusive. *See Wyandotte Transportation Co. v. United States, supra,* 389 U.S. at 200–201, 88 S.Ct. 379. In that case the court recognized that to limit the government to remedies explicitly authorized under the Act would withhold remedies that would ensure the effectiveness of the Act. The court was not prepared to impute to Congress a futility inconsistent with the great design of the legislation.

which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States."

This section grants jurisdiction to the district court to enforce by injunction removal of structures erected in violation of Sections 9 and 10. It further grants power to the Attorney General to institute such injunctive proceedings. Neither of these grants rise to the level of an express prohibition against private suits. Moreover, the first jurisdictional grant would seem to encompass all injunctive suits, both private and governmental. In a case involving a somewhat analogous statutory scheme, the United States Supreme Court held that a provision for enforcement by the Attorney General did not preclude a private right of action. See *Allen v. State Board of*

*Elections*, 393 U.S. 544, 554–557, 89 S. Ct. 817, 22 L.Ed.2d 1 (1969).[11] In view of that case and because the Court believes that a private right of action is necessary to effectuate the purposes intended to be served by the Act, the Court cannot find, either expressly or impliedly, in Section 12 of the Rivers and Harbors Act any exclusive vestment of enforcement powers in the Attorney General. The Court does note that Section 17 provides, *inter alia*, that the Department of Justice "shall conduct the legal proceedings necessary to enforce" Sections 9 and 10.[12] In light of the language of that entire section, however, the Court believes that Section 17 merely creates a duty of enforcement in the Justice Department and vests exclusive enforcement of the criminal provisions in that department. Accordingly, the Court concludes that nothing in the Act precludes private suits to redress injury

11. In *Allen v. State Board of Elections*, a similar statute was before the court. There 42 U.S.C. § 1973j(f) provided that the district courts would have jurisdiction over proceedings brought pursuant to that section of the Voting Rights Act of 1965. Another subsection of that same section of the statute provided that the Attorney General may bring actions for preventive relief whenever any person engaged in acts prohibited by certain sections of the Voting Rights Act. 42 U.S.C. § 1973j(d). Notwithstanding this explicit grant of power to the Attorney General, the court found that enforcement of the Voting Rights Act was not vested exclusively in him and held that a private right of action existed under Section 5 of the Voting Rights Act. In the instant case these two grants of power (*i. e.*, jurisdiction in the district court and power to enforce on the part of the Attorney General) are found in two separate clauses in one sentence rather than in two separate subsections of a statutory provision as in *Allen*.

12. Section 17 provides:

"The Department of Justice shall conduct the legal proceedings necessary to enforce the provisions of sections 401, 403, 404, 406, 407, 408, 409, 411, 549, 686, and 687 of this title; and it shall be the duty of United States attorneys to vigorously prosecute all offenders against the same whenever requested to do so by the Secretary of the Army or by any of the officials hereinafter designated, and it shall

furthermore be the duty of said United States Attorneys to report to the Attorney General of the United States the action taken by him against such offenders so reported, and a transcipt of such reports shall be transmitted to the Secretary of the Army by the Attorney General; and for the better enforcement of the said provisions and to facilitate the detection and bringing to punishment of such offenders, the officers and agents of the United States in charge of river and harbor improvements, and the assistant engineers and inspectors employed under them by authority of the Secretary of the Army, and the United States collectors of customs and other revenue officers shall have power and authority to swear out process, and to arrest and take into custody, with or without process, any person or persons who may commit any of the acts or offenses prohibited by the said sections, or who may violate any of the provisions of the same: *Provided*, That no person shall be arrested without process for any offense not committed in the presence of some one of the aforesaid officials; *And provided further*, That whenever any arrest is made under such sections, the person so arrested shall be brought forthwith before a commissioner, judge, or court of the United States for examination of the offenses alleged against him; and such commissioner, judge, or court shall proceed in respect thereto as authorized by law in case of crimes against the United States." 33 U.S.C. § 413.

to private persons due to violations of the Act.[13]

▉ Third, the Court concludes that allowance of a private right of action where a plaintiff alleges he has been specifically injured by a violation of Sections 9 and 10 is necessary to effectuate the purposes intended to be served by the Rivers and Harbors Act of 1899 and hence is consistent with the underlying purposes of the legislative scheme. Although the Attorney General can bring civil suits to redress such injuries, he has neither the time, staff, nor incentive to see that all injuries caused by violations of the Act are redressed. As in *Allen v. State Board of Elections, supra*, 393 U.S. 544, 89 S.Ct. 817, implication of a private right of action is necessary or the Rivers and Harbors Act of 1899 will become practically unenforceable against specific injuries to private parties. Accordingly, the Court concludes that implication of a private right of action under Sections 9 and 10 would be consistent with the broad purposes of the Act.[14]

▉▉ Finally, although it might be remotely possible [15] for the plaintiffs to bring a common law nuisance suit in

state court against the defendants, the Court concludes the instant case is not the type of action which is traditionally relegated to state law in an area basically the concern of the states. There is a federal interest in protecting persons from injuries resulting from unauthorized obstructions to the navigable capacity of navigable waters of the United States and possible federal intrusion into the area of state nuisance law is necessary so that the federal interest asserted here will not be compromised by contrary state law. *Cort v. Ash* is distinguishable as in that case the interest which plaintiff sought to vindicate (*i. e.*, breach of fiduciary duty by corporate directors arising out of an *ulta vires* expenditure of corporate funds) was not the federal interest (*i. e.*, dulling the impact of corporations on federal elections) which Congress had intended to protect when it enacted the Federal Election Campaign Act. *Cort v. Ash, supra*, 95 S.Ct. 2080. Accordingly, the Court concludes that the test established in *Cort v. Ash* requires the finding of a private right of action under Sections 9 and 10 of the Rivers and Harbors Act of 1899.[16]

---

13. The Court agrees that Congress intended to vest exclusive enforcement in the Attorney General of suits to redress public injuries due to violations of the Act. In the case of public injuries, Congress may have felt that no citizen should substitute his judgment for that of the government as to when the public interest required civil relief.

14. The instant case is unlike *Barbour* where Congress created a corporate entity to solve a public problem and then provided for substantial supervision of its operations by an agency charged with the protection of the public interest (*i. e.*, the S.E.C.). It is also unlike *Amtrak* where the legislative intent and the statute itself clearly indicated that Congress was conferring a private right of action only on a limited class of private parties (*i. e.*, employees who were the beneficiaries of certain labor agreements). Additionally, by allowing a private action in *Wisconsin v. Illinois*, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426 (1929), albeit by a state, the Supreme Court has at least *sub silentio* recognized the existence of a private right of action under Section 10.

15. It is not at all clear to the Court that a common law nuisance suit to redress the type of injuries alleged by plaintiffs in the instant case would be cognizable in state court. Traditionally suits of this nature could only be brought to redress injuries to property interests and hence the availability of a common law nuisance suit may be severely restricted in many cases. W. Prosser, *The Law of Torts*, § 89 (4th Ed. 1971). Although California appears to have adopted a more liberal rule, *e. g.*, 36 Cal.Jur.2d, *Nuisances* § 30 (1957), which might conceivedly cover the instant factual situation, the Court need not determine the scope of California nuisance law, as the key factor here is that any possible federal intrusion in to the area of state nuisance law is necessary and proper to vindicate plaintiffs' federal rights.

16. Federal defendants' reliance on *Amtrak, supra*, 414 U.S. 453, 94 S.Ct. 690, is inapposite. In that case the legislative history expressed a clear intent to exclude private suits, except as to certain cases, involving labor agreements where private suits were

## B. *The Merits of the Claim*

Plaintiffs' first claim is that the construction and present operation of the Tracy and Delta Plants and the proposed construction of the Peripheral Canal, in the absence of the proper authorization, are in violation of Sections 9 and 10 of the Rivers and Harbors Act of 1899. 33 U.S.C. §§ 401, 403. The Court must determine whether the construction and operation of any of the three structures requires authorization pursuant to Sections 9 and 10, and if such authorization is or was required as to any of the structures, whether statutorily sufficient authorization was obtained.

### 1. *Section 9*

Section 9 provides that it shall be unlawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any navigable water until (1) the consent of Congress to such construction has been obtained, and (2) the plans for such construction have been approved by the Chief of Engineers and the Secretary of the Army. That section contains a proviso to the effect that state authorization may replace Congressional consent in the case of waterways whose navigable portions lie wholly within the boundaries of a single state. However, even in that case, approvals by the Chief of Engineers and by the Secretary of the Army are still required.[17]

With respect to the Peripheral Canal, it is clear that Section 9 authorization will be required before any party commences building the Canal as it is presently proposed. At the point where the Canal crosses the Middle River, the Canal will result in the complete damming of the river. Furthermore, there is presently no provision for the passage of boats past the Canal at this location. Such a closure of the Middle River will constitute the building of a "dike" within the meaning of Section 9. In *Citizens Committee for the Hudson Valley v. Volpe*, 302 F.Supp. 1083, 1089 (S.D.N.Y. 1969), *aff'd.*, 425 F.2d 97 (2d Cir. 1970), the court held that the word "dike" should be defined in accordance with its ordinary meaning. The court found that dike meant, *inter alia*, "[a]n embankment for controlling or holding back the waters of the sea or a river". 302 F.Supp. at 1089. The Court notes that "dam" is defined as "a barrier pre-

expressly authorized. 414 U.S. at 457–465, 94 S.Ct. 690. Nor does *Connecticut Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81 (2d Cir. 1972), support federal defendants' position. In that case the court held an individual may not sue on behalf of the public for general injuries caused by violations of the Rivers and Harbors Act of 1899. The court expressly reserved the question decided here, whether a private claimant specifically injured by a violation may sue for an injunction or damages. 457 F.2d at 89, 90 n. 16. See *James River & Kanawha Canal Parks, Inc. v. Richmond Metropolitan Authority*, 359 F. Supp. 611, 638–640 (E.D.Va.), *aff'd.*, 481 F.2d 1280 (4th Cir. 1973), for a well-reasoned decision in support of the result reached here. Because this action is one brought not on behalf of the public but rather by private plaintiffs who allege specific injuries to themselves, the Court concludes that a private right of action exists in the present case.

17. 33 U.S.C. § 401 provides:
"It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: *Provided*, That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construction is commenced: *And provided further*, That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army."

venting the flow of water". Webster's Third New International Dictionary, p. 571 (1971). Hence, even though the closure of Middle River will be caused by a structure denoted as a "canal", because that structure will have the effect of a "dam" or "dike", the Court finds that the Peripheral Canal is the type of structure regulated by Section 9. Because the Peripheral Canal will clearly be "in" the Middle River, the only issue remaining is whether Section 9 prohibits any dikes or only those dikes which obstruct navigation. Although the legislative intent underlying the enactment of Section 9 may well have been to prohibit unreasonable obstructions to navigable waters, it seems likely that Congress used the word "any" in Section 9 in order to reserve the right to determine whether a given structure created an unreasonable obstruction. Because the Peripheral Canal will obstruct navigation on the Middle River, however, either construction of Section 9 will include the Canal within the section's regulatory prohibitions. *Citizens Committee for the Hudson Valley v. Volpe, supra,* 302 F. Supp. at 1089. *But cf. Petterson v. Resor,* 331 F.Supp. 1302, 1306 (D.Ore. 1971).

With regard to the type of authorization required, since the navigable waters which the Peripheral Canal will obstruct are all wholly within California, Congressional consent is not necessary as long as the Canal is authorized by the California State Legislature. It is not clear to the Court whether the passage of the Burns-Porter Act constitutes such authorization, as that Act did not specifically envision the Peripheral Canal. Because no evidence was adduced at trial as to whether the legislature has subsequently authorized the construction of the Canal, the Court merely holds that such authorization must be obtained prior to the commencement of construction. Moreover, defendants must obtain a Section 9 permit from the Corps of Engineers and the Department of the Army prior to construction.

With respect to the Delta and Tracy Plants, plaintiffs argue that various components of these facilities constitute the type of structures regulated by Section 9. Most of these components, however, are clearly not "over or in" any of the navigable waters in question, and those few components which arguably are "over or in" navigable waters are not the type of structure regulated by Section 9. Both of the main pumping plants of the Tracy and Delta Plants are at least two miles distant from any navigable waters and are connected thereto only through the construction of certain man-made inlet channels. The only components which would be said to be "over or in" navigable waters are the headworks and fish protective facilities of the Tracy Plant.[18] However, these components are not a "bridge, dam, dike, or causeway".[19] Ac-

18. The headworks and fish protective facilities of the Delta Plant are not "over or in" navigable water because they are set back on a small inlet constructed by the state defendants off West Canal.

19. The Court need not decide whether the Tracy Plant headworks or fish protective facility is "over or in" navigable waters, as neither structure fits within the definitions of any of the structures enumerated in Section 9. Clearly neither is either a "dam" or a "dike" as defined, *supra,* since neither is "an embankment for controlling or holding back the waters of the sea or a river" or is "a barrier preventing the flow of water". They also are not causeways, as neither is "a raised road across water or marshy land with water or marshy land on both sides of the road". *Citizens Committee for the Hudson Valley v. Volpe, supra,* 302 F.Supp. at 1089. Finally, neither structure is a bridge as neither is "a structure erected over a depression or obstacle to travel (as a river, chasm, roadway, or railroad) carrying a continuous pathway or roadway (as for pedestrians, automobiles, or trains)." Webster's Third New International Dictionary, p. 276 (1971). The scope of Section 10 of the Rivers and Harbors Act of 1899 is substantially broader than the proscriptions of Section 9 as the latter section regulates only several specific types of structures while the former section utilizes very general language so as to include within its proscriptions

cordingly, neither the construction of the Tracy or Delta Plants nor of any of their component structures was unlawful with respect to Section 9.

### 2. *Section 10*

Section 10 contains three proscriptive clauses. The first clause prohibits the creation of any obstruction to navigable capacity not affirmatively authorized by Congress. The second clause makes it unlawful to build or commence the building of certain structures except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army. Finally, the third clause makes it unlawful to alter or modify in any manner the condition or capacity of the channel of any navigable water unless such alterations or modifications are recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.[20]

### a. *Scope of Section 10*

▓▓▓▓▓ In determining whether Section 10 requires authorization of the three structures involved in this case, the Court confronts two threshold questions concerning the coverage of that section. First, defendants contend that because certain of these structures are not located over or in any navigable water, they are not within the ambit of Section 10. This contention is without merit. It is clearly established that Section 10 does not require the existence of an obstruction over or in navigable wa-

ters. *United States v. Republic Steel Corp.*, 362 U.S. 482, 486, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960); *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 708, 19 S.Ct. 770, 43 L.Ed. 1136 (1899). *See Wisconsin v. Illinois, supra,* 278 U.S. 367, 49 S.Ct. 163; *Sanitary District of Chicago v. United States,* 266 U.S. 405, 45 S.Ct. 176, 69 L. Ed. 352 (1925). In *Republic Steel* the obstruction to navigable capacity was caused by defendant's dumping of industrial solids into a river. In *Wisconsin v. Illinois* and in *Sanitary District of Chicago,* the obstruction consisted of a lowering of the water level of Lake Michigan as the result of the diversion of lake water through the Chicago River Drainage Canal. Finally, in *Rio Grande* the obstruction was caused by a dam in a portion of a nonnavigable waterway which fed into the navigable waters in question. Defendants' contention that Section 10 is inapplicable to the instant case because both the Delta and Tracy Plants are approximately two miles from navigable waters is untenable if these structures in fact create obstructions to navigable capacity. The test of whether a Section 10 permit is required for a particular project is not wholly dependent upon the location of specific structures but looks also to the operational effect of the project. It is not only the physical structure of the Delta Plant, the Tracy Plant, or the Peripheral Canal which is significant but also the operation of these structures.[21] If the func-

---

both certain specific structures and any structure which has the effect of obstructing navigable capacity.

**20.** 33 U.S.C. § 403 provides:
 "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of

Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

**21.** As far as the Peripheral Canal is concerned, it is not clear whether the necessity to obtain authorization under Section 9 preempts the need for Section 10 approval. See

tional effect of these structures is to obstruct navigable capacity in the Delta, then Section 10 approval will be required.

Second, defendants contend that in order to establish a violation of Section 10, plaintiffs have to prove that the actions in question actually affect navigation. Yet the plain wording of the statute is directly at odds with such a construction. Moreover, Section 9 demonstrates that Congress must have been aware of the difference between obstructions to navigation and obstructions to navigable capacity. Although research has not revealed any case which is dispositive of this question,[22] the

Court concludes that once there is a finding that the obstruction in question has a substantial effect on navigable capacity, it is not necessary to prove that on specific occasions the obstruction precluded or limited navigation on the waterway in question by specific vessels. Obstructions to navigation differ from obstructions to navigable capacity. The former denotes the actual, present obstruction of navigation while the latter denotes the potential or capacity to obstruct navigation currently or in the future. Proof of the former requires a showing that navigation by specific vessels is presently obstructed while proof of the latter only requires a showing

---

pp. 626–627, *supra.* It is the opinion of the Court that no such preemption automatically occurs. The two sections deal with different although possibly related problems and therefore satisfactory resolution of one would not necesarily imply adequate resolution of the other. More specifically, the consequences of the damming of Middle River may be different and are more or less independent from those which arise due to the diversion of water from the Sacramento River. Clearly, however, defendants are not precluded from seeking and obtaining Section 9 and 10 authorization from the Secretary of the Army in one proceeding or one permit application.

22. The principal Section 10 cases are not dispositive of this question. Because the findings of fact of the lower court are not reported in *Sanitary District of Chicago*, it is not clear whether the plaintiff in that case introduced any evidence of effects on navigation caused by the diversion of water from Lake Michigan. There were apparently no witnesses at trial who testified that they actually observed the lowering of the Lake Michigan water level. 266 U.S. at 412, 45 S.Ct. 176. Plaintiff apparently relied on the analyses of expert witnesses. *Ibid.* The court also found that in 1913 the Secretary of War reviewed the Chicago Drainage Canal diversions, including "the obvious fact that so large a withdrawal would lower the levels of the Lakes and the overwhelming evidence that it would affect navigation". However, there is no indication that any of this evidence was adduced at trial. *Ibid.* at 430, 45 S.Ct. at 180. There is language in the opinion which strongly indicates that plaintiffs here need not prove a present effect on navigation. The court stated:

"Evidence is sufficient, if evidence is necesary, to show that a withdrawal of water

on the scale directed by the statute of Illinois threatens and will affect the level of the Lakes, and that is a matter which cannot be done without the consent of the United States, even were there no international covenant in the case." *Ibid.* at 426, 45 S.Ct. at 179.

Additionally, it is relevant to contrast the extent of the diversions in that case with those in the instant case. In *Sanitary District of Chicago*, the United States sought to enjoin any diversion of water from Lake Michigan in excess of 4,166 cfs (250,000 cubic feet per minute) while in the instant case the present combined water diversion of the Delta and Tracy Plants is 10,900 cfs. Also, Lake Michigan which has a surface area in excess of 20,000 square miles is a substantially larger body of water than those navigable waters in the Delta out of which the Tracy and Delta Plants will divert water. While the court in *Wisconsin v. Illinois, supra,* 278 U.S. at 407–409, 49 S.Ct. 163, expressly found that the Chicago Drainage Canal had an adverse effect on navigation resulting in the loss of 3,-346,000 ton miles of water haul on the Great Lakes, it also found that the operation of that canal lowered the water level in four of the Great Lakes by between approximately five and six inches. Finally, in *United States v. Republic Steel Corp., supra,* 362 U.S. at 489, 80 S.Ct. 884, the court reasoned that if the lowering of the water level could constitute an obstruction to navigable capacity, as in *Sanitary District of Chicago*, then the deposit of industrial solids in a navigable river resulting in a decrease in the water depth in that river also constituted an obstruction to navigable capacity. However, the court in *Republic Steel Corp.* did note the shallower water would affect navigation.

that a condition exists which would obstruct navigation over the waterway if it existed. In the latter case all that is required is proof of the condition which creates the obstruction which has a substantial effect on navigable capacity. Once plaintiffs prove this fact, it is immaterial that they do not prove that navigation by specific vessels on the waterway in question is presently obstructed.

■■■ Under Section 10 therefore, the question before the Court with respect to each of the three structures involved in this case is whether the structure itself or its operational effect is an obstruction to the navigable capacity of any navigable water. The Supreme Court has defined "obstruction to the navigable capacity" to mean to interfere with or diminish the navigable capacity of the waterway in question.[23] *United States v. Rio Grande Dam & Irrigation Co., supra,* 174 U.S. at 709, 19 S.Ct. 770. Furthermore, whether construction and operation of a particular facility creates an obstruction to navigable capacity is a question of fact. *United States v. Rio Grande Dam & Irrigation Co., supra,* 174 U.S. at 709, 19 S.Ct. 770.[24]

Turning first to the Tracy Plant, the evidence adduced at trial establishes that the operation of the facility has two major effects on water in the Delta: (1) It tends to lower the water levels in the Delta, and (2) It causes net flow reversals.[25] Between 1945 and 1949 the Bureau of Reclamation conducted a study of the effect on Delta water levels of export pumping by the Tracy Plant. The study concluded that with a low flow[26] in the San Joaquin River and with the Tracy Plant pumping at the rate of 4600 cfs, the Delta water level in the vicinity of Clifton Court Ferry would be lowered approximately four inches, while there would be no measurable change in the Delta water level near the Stockton ship channel. This study utilized a hydraulic and mathematical model and was not based on actual data since the Tracy Plant was not in operation at that time. In 1968 further studies of the effect of the Tracy Plant pumping on Delta water levels were conducted by varying the pumping rates and measuring the actual effect on water levels at various points in the Delta. One study concluded that Delta water levels near the junction between the inlet channel and Old River would be lowered by $\frac{1}{10}$ of a foot per 1,000 cfs pumped, and that Delta water levels would be lowered by decreasing amounts per 1,000 cfs in proportion to the distance from the Tracy Plant. Export pumping effects were measurable as far away as the San Joaquin and Sacramento Rivers. Furthermore, a preliminary draft, subject to review, of the State's Environmental Impact Report (Plaintiffs' Exhibit 17), predicted that at a future export rate of 15,000 cfs, water levels near the San Joaquin River[27]

23. Navigable capacity means the capacity for navigation over any part of the waters in question when in their normal condition. *Hubbard v. Fort,* 188 F. 987, 996 (C.C.D. N.J.1911).

24. In that case the court stated that not every appropriation of the upper waters of a navigable stream would constitute an obstruction to navigable capacity, but rather that the test was whether any such appropriation substantially interfered with navigable capacity within the limits where navigation was a recognized fact.

25. Because the Delta is directly affected by the Golden Gate tidal cycle, water in the Delta channels and rivers tends to flow both up channel and down channel during the tidal cycle. However, for any given tidal cycle there is a greater volume of flow in one direction and the amount of this excess is the net flow. A net flow reversal occurs when the net flow for a given tidal cycle is in a different direction than the normal direction.

26. Low flow was defined in the study as the worst condition that could occur.

27. However, at trial, Gerald Cox, a civil engineer with the Department of Water Resources, testified that the preliminary draft was inaccurate in that the point referred to was actually at Clifton Court Ferry which he felt was some distance from the San Joaquin River.

could be lowered as much as 1½ feet at low tide.[28]

The evidence also established that the operation of the Tracy Plant has caused a greater flow of San Joaquin River water into Old River toward the Tracy Plant than occurred under pre-Tracy Plant conditions, and during summer periods of low flow in the San Joaquin, there can be a net reversal in the flow of the San Joaquin River between San Andreas Landing and Old River. Additionally, operation of the Tracy Plant in conjunction with the Delta Cross Channel also draws water from the Sacramento River on the edge of the Delta to the interior Delta and to the export pumps.

Similarly, the operation of the Delta Plant tends to lower water levels in the Delta region and to cause net flow reversals. Prior to the construction of Clifton Court Forebay, the Delta Plant operations resulted in lowered water levels in Italian Slough and caused bank erosion problems due to the increased speed of flow. A test conducted by the State in August and September of 1968 indicated that an increase in pumping by 6100 cfs by both the Delta and Tracy Plants resulted in a lowering of the water level in Italian Slough by 9⁄10 of a foot. Subsequent tests indicated that diversions of water into Clifton Court Forebay would have an even greater effect on water levels in the Delta. Combined diversions by the Forebay intake facility and the Tracy Plant between 9600 and 12,000 cfs during both high high and low high tides resulted in a lowering of the water level at Clifton Court Ferry by 1 to 1½ feet and a lowering at Rindge Pump (located on the San Joaquin River) of just under 1⁄10 of a foot.[29] While there may be some question as to the accuracy of these figures, they are found to be the minimum effect on Delta water levels of water diversions by the Forebay and the Tracy Plant[30] since they were offered by the state defendants. It is quite conceivable that the effects could be greater and it is highly probable if not certain that an expanded pumping capacity would result in even greater effects.

The operation of the Delta Plant has caused net flow reversals in the San Joaquin River during some summer months, and during most of the year in the Old and Middle Rivers. The state defendants marked for identification a chart which apparently illustrated some specific effects on flow reversals as a result of export pumping by the Delta and Tracy Plants. This exhibit was not introduced into evidence, and hence there is no detailed evidence of the magnitude of net flow reversals caused by export pumping. There was, however, testimony from which it can be inferred that operation of the Clifton Court Forebay intake facility has the potential to affect water velocities significantly in nearby channels.[31] Finally, a preliminary draft subject to revision, of the State's Environmental Impact Report on

---

28. The data from part of the 1968 studies reflects the effect on Delta water levels from the combined export pumping of both the Tracy and Delta Plants. However, part of the study isolated the effects attributable to the Tracy Plant and reached almost the exact same results as the 1945–1949 study.

29. Throughout this most recent test in May of 1974, the Tracy Plant operated at close to its maximum pumping capacity. Hence, the test results would seem to reflect only those changes in the water level due to the Delta Plant diversions.

30. During the trial Dr. James A. Harder, an expert witness for the state defendants, stated

unequivocally that if the Clifton Court Forebay radial gates were opened wide at low low tides, and the water level of the Forebay was lower than that at Clifton Court Ferry, then the water level outside the Forebay would be lowered.

31. There was testimony that the operation of the Clifton Court Forebay radial gates was limited by the state defendants so that the water velocity in the nearby channels would not exceed 3 feet per second. The reason for this operational limitation was to prevent bedload movement in the adjacent channels. Bedload movement is the movement of the bottom sands of the channel due to high water velocity.

the Peripheral Canal contained statements from which the Court could infer that Delta export pumping through the Tracy and Delta Plants caused the Old and Middle Rivers to flow upstream occasionally at Bacon Island and caused the San Joaquin River to flow upstream occasionally below the head of Old River.

With respect to the proposed operation of the Peripheral Canal, the evidence established that there would be significant effects on the velocity' and water level of the Sacramento River. If constructed, the Peripheral Canal will divert waters from the Sacramento River near Hood, California. The rate of flow of water in the Sacramento River at that location varies between 10,000 cfs and 100,000 cfs. Donn J. Stafford, a civil engineer with the Department of Water Resources, testified that at various times during the year the Canal would divert significantly more than 50% of the Sacramento River flow and at times could divert as much as 80% of that flow. It also appeared that diversion would decrease the velocity and lower the water level of the Sacramento River downstream from the Peripheral Canal intake. Finally, the Canal would result in the closure or modification of a number of rivers and sloughs in the Delta including the complete damming of the Middle River. With respect to the Middle River closure, no provision has been made for the passage of boats past this point on the River.

■ In sum, with respect to the Delta and Tracy Plants the evidence adduced at trial was clear and convincing that export pumping by these facilities both lowered Delta water levels and at certain times caused net flow reversals in Delta waterways. Although it is true that the exact magnitude of these effects was not precisely established, it is clear that they are far from any sort of *de minimis* exception established by *Rio Grande*. Because there was evidence that the water level would be lowered at least one to 1½ feet in the vicinity of ·Clifton Court Ferry, the Court will not decide whether the smaller effects (i. e., several inches) at locations considerably more distant from the pumping plants, standing alone, would constitute a sufficient obstruction to navigable capacity so as to require Section 10 approval.

■ With respect to the Peripheral Canal, the evidence regarding the anticipated effects on navigable capacity was even less precise with respect to magnitude but equally convincing that the effect would be substantial. It was clear that at various times throughout the year the Peripheral Canal would divert substantial amounts of water from the Sacramento River in the vicinity of Hood, California, and that these diversions would both lower the water levels and decrease water velocities downstream from the intake facility.

Accordingly, the Court concludes that the operation of the Tracy and Delta Plants presently obstructs the navigable capacity of various navigable waters in the Delta.[32] The Court further concludes that as presently proposed, the Peripheral Canal will also result in an obstruction to navigable capacity of the Sacramento River. More specifically, the Court finds that, in the case of each of the three facilities, the obstruction is the result of the modification or alteration of the condition or capacity of the channel of navigable water of the United States and hence is governed by the third clause of Section 10.

b. *Authorization under Section 10*

■ Since Section 10 requires that authorization be obtained for the con-

---

32. The operation of the Delta and Tracy Plants results in the obstruction of the navigable capacity of Old River, which is a navigable water of the United States. Since obstruction of the navigable capacity of this river suffices to bring the Tracy and Delta Plants within the scope of Section 10, the Court need not decide to what extent diversions by the Tracy and Delta Plants obstruct the navigable capacities of sloughs, canals, and other rivers in the Delta.

struction and operation of the Tracy and Delta Plants and the proposed construction and operation of the Peripheral Canal, the Court now turns to the question whether any of these facilities has been properly authorized. Although the statute itself is somewhat unclear as to what constitutes proper authorization, in a case such as the instant one governed by the third clause, the United States Supreme Court definitively resolved this ambiguity in the landmark case of *Wisconsin v. Illinois, supra,* 278 U.S. 367, 49 S.Ct. 163. The Court held in that case that congressional authorization was not necessary for obstructions within the purview of the second and third clauses of Section 10 and that those obstructions need only be recommended by the Chief of Engineers and authorized by the Secretary of the Army.[33] 278 U.S. at 412–413, 49 S.Ct. 163. While congressional consent is an alternative, it is not necessary for obstructions falling within the second and third clauses of Section 10 if the approval of the Secretary of the Army is obtained.

Accordingly, the Court addresses the question whether any of the three facilities has been authorized by Congress or by the Secretary of the Army upon recommendation by the Chief of Engineers. With respect to the Peripheral Canal, defendants make no contention that such authorization has been obtained.[34] With respect to the authorization of the Delta and Tracy Plants, defendants have made three basic contentions regarding authorization: (1) that various Section 10 permits which have been issued over the

years authorize the facilities, (2) that approval of the navigation aspects of the subject matter of FPC license application No. 2426 by the Secretary of the Army and the Chief of Engineers eliminates the need for Section 10 approval, and (3) that any number of congressional acts (mostly appropriation acts) constitute congressional consent pursuant to clause one of Section 10. For the reasons set forth below, the Court disagrees with all three contentions and, accordingly, finds the construction and operation of the Tracy and Delta Plants without the required authorization to be unlawful.

### i. *Section 10 Permits*

 The federal defendants contend that the Secretary of War approved the Tracy Plant in a letter to the Secretary of Interior dated February 15, 1946. At the trial that letter was never offered as an exhibit and although the federal defendants never abandoned this contention, they did not provide the Court with a copy. The Court, taking judicial notice of the letter which is contained in S.Doc. No. 113, 81st Cong., 1st Sess. 275 (1949), obtained a copy of the letter from the Public Library. An examination of this letter revealed that its subject matter basically concerned a jurisdictional dispute between the Department of Interior and the Department of War over the construction and operation of reservoir projects in the Sacramento-San Joaquin Basin. Nowhere in the letter was the Tracy Plant specifically mentioned. The only tenuous connection between the Tracy Plant and the letter

---

33. The main problem is interpreting the interrelationship of the three clauses in Section 10. These could be read as three independent prohibitions proscribing three different and mutually exclusive types of obstructions. However, in one early case, a lower court held that congressional consent was mandatory as to each type of obstruction and that clauses two and three were merely delegations to the Secretary of the Army of a supervisory power over the character and performance of the proposed construction where the work in question was of the specific type described in those

clauses. *Hubbard v. Fort, supra,* 188 F. at 997. That position was expressly overruled in *Wisconsin v. Illinois, supra,* 278 U.S. at 412–413, 49 S.Ct. 163.

34. With respect to the Peripheral Canal, it is conceded that its construction will require authorization under Sections 9 and 10 of the Rivers and Harbors Act of 1899. For the reasons set forth herein, a permit under Section 10 will likewise be required for its operation.

is that the Tracy Plant was part of the broad plan for the Central Valley Basin referred to in the letter. The letter on its face characterizes itself as the views and recommendations of the War Department on the Bureau of Reclamation's report on the Central Valley Basin pursuant to Section 1 of the Flood Control Act approved December 22, 1944. Additionally, this letter does not rise to the level of formality of the other Section 10 permits introduced into evidence. Not only does this letter not constitute a Section 10 permit, it is clear that it does not even constitute approval of the Tracy Plant.

■ The federal defendants next contend that in any event in 1955 the Bureau of Reclamation applied for and received a permit to construct fish collecting facilities and headworks at the junction of the Old River and the Tracy Plant intake channel, and that this permit constitutes Section 10 authorization. However, the narrow scope of that permit simply does not support such a contention. It provided specifically that "[t]he structures and work shown on the drawings hereto attached and presented in your letter dated 25 August 1955, for construction of headworks and fish collecting facilities at the junction of Old River and the Delta-Mendota Canal, Contra Costa County, California, have been recommended by the Chief of Engineers and are authorized by the Secretary of the Army." See Plaintiffs' Exhibit 22. In this permit no mention is made of the other structures (i. e., the pumping plant) or of the operation of those facilities. The limited scope of the permit is also reflected in the Bureau of Reclamation's application. That application describes the proposed construction of the headworks and fish collecting facilities. It specifically states that "[r]equest is hereby made for a

permit for the Bureau of Reclamation to construct the headworks and fish collecting facilities in accordance with the above data and drawings." See Plaintiffs' Exhibit 22. Additionally, in the application, the Bureau of Reclamation states that it is not sure whether "a permit from you will be necessary *to perform this particular work*" (emphasis supplied), but is submitting one anyway so that the Corps can make the determination. See Plaintiffs' Exhibit 22.

The state defendants contend that various Section 10 permits issued with respect to certain components of the Delta Plant constitute authorization under Section 10 of the construction and operation of the entire Delta Plant and not merely the specific components. The Department of Water Resources at no time applied for a permit from the Chief of Engineers or the Secretary of the Army pursuant to Sections 9 and 10 of the Rivers and Harbors Act of 1899 with respect to the construction of the Delta Plant or its original intake channel. It did, however, apply for several Section 10 permits in conjunction with the construction of Clifton Court Forebay. On June 28, 1966, the Department of Water Resources applied for a Section 10 permit authorizing it to build a permanent dike across Italian Slough approximately one mile southwest of Old River. Although the Corps issued such a permit (#4014) on February 10, 1967, the Department of Water Resources abandoned its plan and instead built a closure dike at the junction between the original intake channel and Italian Slough.[35] On February 24, 1967, the Corps issued a permit (#4006) authorizing the construction and maintenance of a water quality monitoring recorder station in Old River at Clifton Court Forebay. On May 3, 1967, the Department of Water Resources applied for a

---

35. It should be noted that the Department of Water Resources never received a permit to construct this dike. However, in its application for a permit to construct the Clifton Court Forebay inlet control structure, see

*infra*, the Department did state that "[w]hen the forebay becomes operational, we will close our present inlet structure by replacing a section of the Italian Slough levee." See Plaintiffs' Exhibit 25.

Section 10 permit to cut the westerly levee of West Canal and Old River in order to build an inlet control structure for Clifton Court Forebay. Subsequently, permit #4101 was issued on June 15, 1967, authorizing the cutting of the westerly levee of West Canal. Finally, on June 17, 1969, the Corps of Engineers issued permit #4410 authorizing the Department of Water Resources to install velocity meters and bury armored cables five feet deep in West Canal. That permit contained a condition requiring the Department of Water Resources to comply promptly with regulations of the Federal Water Pollution Control Administration and/or the state water pollution control agency having jurisdiction.

 The Court finds that these permits do not constitute Section 10 authorization. These permits authorized only the specific construction work described in the applications and not the construction of the entire pumping plant facilities. It is insufficient to assert that because the Corps of Engineers was a member of the Interagency Delta Committee and a participant in other studies of Delta water problems, it must have had constructive knowledge of the entire facility, and consequently that approval of the components must be deemed approval of the whole facility. There is no direct evidence from the particular permit files that the Corps was approving the entire facility when it approved the various components.[36] Even assuming strong circumstantial evidence of constructive knowledge, this evidence would not constitute approval of the construction of the facilities. The fact that the Corps had knowledge of the Delta Plant does not imply that it approved the Delta Plant. Additionally, it is clear that all of these permits were obtained after construction had commenced. Even if the Court believed that these permits authorized the *construction* of the Delta Plant, it is clear that they do not authorize the *operation* of that facility. Because of the clear adverse effects on navigable capacity and the possible adverse environmental effect of export pumping under certain factual situations, it is inconceivable that the Corps of Engineers would have granted any permits without incorporating certain conditions of operation therein, and without appending in its files a sufficient factual record to show the type of consideration required by the Rivers and Harbors Act of 1899 and the various environmental statutes then in effect.[37] The Department of Water Resources recognizes certain adverse effects of the Delta Plant diversions, and it has an operational policy of never opening the Forebay radial gates during the three-hour period before and after low low tide. Additionally, it operates those radial gates so as never to allow the water velocity in the nearby channels to exceed three feet per second. In the absence of a clear showing that the Corps was in fact approving the operations of these facilities, the Court is compelled to find no authorization through the Section 10 permit procedure. It seems most likely that the Corps misconstrued the scope of Section 10's coverage.[38]

ii. *The FPC License*

The state defendants next contend that approval by the Corps of Engineers of the navigational aspects of the subject matter underlying FPC license application No. 2426 constituted Section 10 approval or eliminated the need to ob-

---

36. See Plaintiffs' Exhibits 22, 22A, 23, 24, 24A, 25, 25A; State Defendants' Exhibit 11.

37. For instance, the permits might have limited export pumping to certain levels during the dry parts of the year and during certain parts of the tidal cycle.

38. In considering an application for a Section 10 permit, the Secretary of the Army and the Chief of Engineers must weigh the conservation effects of the subject matter of the application. *Zabel v. Tabb*, 430 F.2d 199, 213 (5th Cir. 1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). Moreover, the Secretary of the Army can refuse to issue a Section 10 permit on conservation grounds. 430 F.2d at 214.

tain Section 10 approval. In December of 1965 the state applied for a Federal Power Commission license for the California Aqueduct and certain other structures, some of which were power related. Among the structures included in the application were the Delta Plant and its appurtenant structures and the Clifton Court Forebay. FPC procedures required the administrative law judge to submit the application to the Corps of Engineers for approval of all navigational aspects of the Project. See 16 U.S.C. § 797(e). Although the Corps sent approval in the form of a letter dated May 18, 1966, there is no evidence that the Corps gave consideration either to environmental factors or to the effect on navigation of water diversions (*i. e.*, by causing changes in water levels and net flow reversals). Although the administrative law judge eventually authorized the license, the FPC reviewed his decision and confined the jurisdiction of the license to those portions of the project involving power facilities, all of which are in Southern California. *Department of Water Resources*, FPC Opinion No. 688 (February 6, 1974).[39]

 The Court finds the state defendants' contentions with respect to FPC license application No. 2426 unfounded. It is not entirely clear to what extent FPC jurisdiction and regulation preempts regulation by Sections 9 and 10 of the Rivers and Harbors Act of 1899. One court has held that no Section 10 permit is required for the construction of a hydroelectric plant licensed by the FPC. *Scenic Hudson Preservation Conference v. Callaway*, 370 F.Supp. 162, 167 (S.D.N.Y.1973) *aff'd.*, 499 F.2d 127 (2d Cir. 1974). The Court does not believe that that decision was intended to allow back-door approv-

al of any structure however remotely related to the basic power project. In *Scenic Hudson* the court limited its holding to the hydroelectric plant. In the instant case the FPC restricted its jurisdiction to those portions of the project involving power facilities and hence *Scenic Hudson* is unhelpful to the state defendants. The rationale underlying *Scenic Hudson* is that there should be one centralized procedure to obtain federal approval of power projects. Its purpose was not to grant an applicant blanket approval for any and all facilities which he described in his license application. Additionally, it is no assistance to state defendants that the Corps sent its letter of approval prior to the FPC's jurisdictional decision. It is quite possible that the Corps felt it was granting approval only to those structures over which the FPC eventually asserted jurisdiction. Also, because the Corps' letter was dated May 18, 1966, and because the state's FPC license application was not amended to include the Clifton Court Forebay until July 10, 1967, it is clear that the May 18th letter did not take into account the Clifton Court Forebay.[40] Notwithstanding *Scenic Hudson*, because the Delta Plant will not be within the jurisdiction of any subsequently issued FPC license No. 2426, the Court must independently assess the May 18th letter and determine whether that constituted Section 10 authorization of the operation of the Delta Plant. The Court concludes that the Corps never seriously took under consideration the effect of water diversions by the Delta Plant when it sent its letter of approval. The letter itself states that "[t]he plans of the structures affecting navigation are satisfactory". This language tends to indicate that if the Corps gave consideration to

---

39. The Court notes that the FPC also remanded the license proceeding to the administrative law judge in order to comply with the NEPA procedures outlined in *Greene County Planning Board v. Federal Power Commission*, 455 F.2d 412 (2d Cir. 1972).

40. In the Agreed Pre-Trial Order the state defendants contended that there was a second

letter from the Corps to the FPC dated January 25, 1968. See *Agreed Pre-Trial Order*, § 4.5.2. Although that letter was introduced into evidence, it did not in any way indicate approval of the navigational aspects of the project.

anything, it was the structures themselves and not the operation of those structures. In the absence of a clear showing that the Corps intended their letter to serve as a Section 10 approval for the Delta Plant, the Court refuses to so construe it.

### iii. *Congressional Authorization*

■■■ The Court also concludes that Congress did not affirmatively authorize any of the facilities in question. Defendants concede that they have obtained no congressional approval of the Peripheral Canal. The federal defendants contend, however, that certain acts of Congress (including, *inter alia*, appropriation acts) constituted consent to the Tracy Plant. Without specifically discussing each individual act, the Court makes the following observations. The initial authorization to create an obstruction must rest on express and not implied congressional authority. *Cf. Hubbard v. Fort, supra,* 188 F. at 996. The approval or funding of a facility does not compromise Congress's right to control its operation. *Sanitary District of Chicago v. United States, supra,* 266 U.S. at 428, 45 S.Ct. 176.

■■■ In the instant case none of the acts in question either contain sufficiently explicit language or are accompanied by a legislative history clearly manifesting approval of the facilities for the purpose of Section 10. For the most part these acts do not even refer specifically to the pumping plant but rather are very general approvals of the Central Valley Project or the San Luis Unit.[41] All Congress did was authorize the construction of those projects and appropriate funds for them. Congress did not, however, agree to relinquish its Section 10 responsibilities or exercise this power in any respect.[42] Even if

---

41. In the Act authorizing the construction of the San Luis Unit of the Central Valley Project, Congress imposed certain restrictions on the operation of that unit. Public Law 86–488, 74 Stat. 156. Specifically, Section 4 of that Act purportedly limited the daily diversion from the Delta via the Tracy Plant under certain conditions. Even if this section were effective, it does not constitute congressional consent. The Act authorized the San Luis Unit (consisting of, *inter alia*, the San Luis Dam, the San Luis Reservoir, the San Luis Forebay (O'Neil Forebay), and the San Luis Canal (California Aqueduct)) and not the Tracy Plant which was already in operation. The fact that Congress places certain limitations on the operation of an already existing facility does not, standing alone, constitute Section 10 authorization for the already existing facility. Section 4 would be just as consistent with an intent to require the diversion of high quality water as it would with an intent to solve navigational and environmental problems in the Delta. Moreover, that section may not be effective, since it appears to be conditioned upon the operation of the San Luis works *solely* as a federal project. The San Luis works are joint use facilities of the state and federal governments. See Agreed Pre-Trial Order, § 3.22. Further, this Act was enacted several years after the commencement of the operation of the Tracy Plant, and hence even if it were intended as Congressional consent, the original construction and operation of the Tracy Plant were unlawful.

42. In *Sanitary District* the Secretary of War had turned down the defendants' Section 10 permit application. Defendants had argued that a prior congressional act granting land to the State of Illinois for a canal to unite the waters of the Illinois River with those of Lake Michigan constituted authorization. The Court rejected their contention stating that:

"The act granted land to Illinois in aid of a canal to be opened by the State for the purpose of uniting the waters of the Illinois River with those of Lake Michigan, but if it has any bearing on the present case it certainly vested no irrevocable discretion in the State with regard to the amount of water to be withdrawn from the Lake. It said nothing on that subject. We repeat that we assume that the United States desires to see the canal maintained and therefore pass by as immaterial all evidence of its having fostered the work. Even if it had approved the very size and shape of the channel by act of Congress it would not have compromised its right to control the amount of water to be drawn from Lake Michigan. It seems that a less amount than now passes through the canal would suffice for the connection which the United States has wished to establish and maintain." 266 U.S. at 427–428, 45 S.Ct. at 179.

Congress had gone so far as specifically to fund the construction of the Tracy Plant precisely as it stands today, this fact would not constitute authorization to operate it, as before operation occurred, either Congress or the Corps of Engineers would have to consider within what Section 10 parameters the Tracy Plant could operate and issue an appropriate authorization.

Accordingly, the Court concludes that the operation of the Tracy and Delta Plants obstructs the navigable capacity of various waters in the Delta, and because these obstructions are the result of the modification or alteration of the condition or capacity of the channel of navigable water, they are governed by the third clause of Section 10. Additionally, because the Court concludes that appropriate authorization has not been obtained, the operation of the Tracy and Delta Plants is and will be unlawful until the proper authorization is obtained. The Court also concludes that, as presently proposed, the operation of the Peripheral Canal will obstruct the navigable capacity of navigable water of the United States, and this obstruction will be governed by the third clause of

Section 10. Because the parties concede that no authorization has been obtained for the Canal, operation of the Canal in the absence of proper authorization would be unlawful.

## III. FISH AND WILDLIFE COORDI-NATION ACT

In their third claim for relief, plaintiffs allege that the construction and operation of the Delta and Tracy Plants, and the proposed construction and operation of the Peripheral Canal, are in violation of Sections 2 and 3 of the Fish and Wildlife Coordination Act (FWCA), 16 U.S.C. §§ 662 and 663.

Section 1 of FWCA is a general policy statement setting forth a declaration of the congressional purpose underlying the Act, namely, that wildlife conservation receive equal consideration with other features of water-resource development.[43] Whenever the waters of any body of water are proposed or authorized to be impounded or diverted by any federal agency or by any public or private agency acting under Federal permit or license, Section 2(a) of FWCA requires that agency first to consult with the United States Fish and Wildlife Service

State defendants' reliance upon *Friends of the Earth v. Armstrong*, 485 F.2d 1 (10th Cir. 1973) (*en banc*), cert. denied, 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974), is misplaced. There, congressional intent was quite explicit both on the face of the acts in question and in the accompanying legislative history. Similarly, in *United States v. Dickerson*, 310 U.S. 554, 555, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940), the Court held that Congress could suspend certain provisions of a prior act (military re-enlistment allowances) through an amendment to an appropriation bill. However, in that case congressional intent was manifestly clear from both the language of the Act and the legislative history.

43. Section 1 provides:
"For the purpose of recognizing the vital contribution of our wildlife resources to the Nation, the increasing public interest and significance thereof due to expansion of our national economy and other factors, and to provide that wildlife conservation shall receive equal consideration and be coordinated with other features of water-resource develop-

ment programs through the effectual and harmonious planning, development, maintenance and coordination of wildlife conservation and rehabilitation for the purposes of sections 661 to 666c of this title in the United States, its Territories and possessions, the Secretary of the Interior is authorized (1) to provide assistance to, and cooperate with, Federal, State, and public or private agencies and organizations in the development, protection, rearing, and stocking of all species of wildlife, resources thereof, and their habitat, in controlling losses of the same from disease or other causes, in minimizing damages from overabundant species, in providing public shooting and fishing areas, including easements across public lands for access thereto, and in carrying out other measures necessary to effectuate the purposes of said sections; (2) to make surveys and investigations of the wildlife of the public domain, including lands and waters or interests therein acquired or controlled by any agency of the United States; and (3) to accept donations of land and contributions of funds in furtherance of the purposes of said sections." 16 U.S.C. § 661.

and with the state agency having jurisdiction over fish and wildlife with a view to the conservation of wildlife resources.[44] Section 2(b) requires, *inter alia*, that Section 2(a) reports be made an integral part of any report prepared or submitted by a federal agency responsible for engineering surveys to Congress or to any agency having the authority to authorize the construction of the water resource development project.[45] Finally, Section 3(a) states that where a federal agency diverts or impounds water, adequate provision consistent with the primary purposes of the diversion shall be made for the conservation, maintenance and management of wildlife resources, including the development and improvement of wildlife resources, pursuant to the provisions of Section 2.[46] Although FWCA was amended in 1958, the predecessor provisions had substantially the same language and created equally extensive duties.

44. Section 2(a) provides:

"Except as hereafter stated in subsection (h) of this section, whenever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States, or by any public or private agency under Federal permit or license, such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particular State wherein the impoundment, diversion, or other control facility is to be constructed, with a view to the conservation of wildlife resources by preventing loss of and damage to such resources as well as providing for the development and improvement thereof in connection with such water-resource development." 16 U.S.C. § 662(a).

45. Section 2(b) provides:

"In furtherance of such purposes, the reports and recommendations of the Secretary of the Interior on the wildlife aspects of such projects, and any report of the head of the State agency exercising administration over the wildlife resources of the State, based on surveys and investigations conducted by the United States Fish and Wildlife Service and such State agency for the purpose of determining the possible damage to wildlife resources and for the purpose of determining means and measures that should be adopted to prevent the loss of or damage to such wildlife resources, as well as to provide concurrently for the development and improvement of such resources, shall be made an integral part of any report prepared or submitted by any agency of the Federal Government responsible for engineering surveys and construction of such projects when such reports are presented to the Congress or to any agency or person having the authority or the power, by administrative action or otherwise, (1) to authorize the construction of water-resource development projects or (2) to approve a report on the modification or supplementation of plans for previously authorized projects, to which sections 661 to 666c of this title apply. Recommendations of the Secretary of the Interior shall be as specific as is practicable with respect to features recommended for wildlife conservation and development, lands to be utilized or acquired for such purposes, the results expected, and shall describe the damage to wildlife attributable to the project and the measures proposed for mitigating or compensating for these damages. The reporting officers in project reports of the Federal agencies shall give full consideration to the report and recommendations of the Secretary of the Interior and to any report of the State agency on the wildlife aspects of such projects, and the project plan shall include such justifiable means and measures for wildlife purposes as the reporting agency finds should be adopted to obtain maximum overall project benefits." 16 U.S.C. § 662 (b).

46. Section 3(a) provides:

"Subject to the exception prescribed in section 662(h) of this title, whenever the waters of any stream or other body of water are impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States, adequate provision, consistent with the primary purposes of such impoundment, diversion, or other control, shall be made for the use thereof, together with any areas of land, water, or interest therein, acquired or administered by a Federal agency in connection therewith, for the conservation, maintenance, and management of wildlife resources thereof, and its habitat thereon, including the development and improvement of such wildlife resources pursuant to the provisions of section 662 of this title." 16 U.S.C. § 663(a).

The Court first addresses the question whether any private right of action arises under FWCA. The only authority on this question of which the Court is aware has answered in the negative. *Environmental. Defense Fund, Inc. v. Corps of Engineers*, 325 F.Supp. 749, 754 (E.D.Ark.1971). See *Environmental Defense Fund, Inc. v. Corps of Engineers*, 325 F.Supp. 728, 739 (E.D. Ark. 1971). Further, plaintiffs simply have not established that inference of such a private right of action would be consistent with the legislative intent of FWCA and with the effectuation of the purposes intended to be served by the Act, as required by *Cort v. Ash, supra,* 95 S.Ct. 2080; *Securities Investor Protection Corp. v. Barbour, supra*, 95 S.Ct. 1733; and *Amtrak, supra,* 414 U.S. at 457–458, 94 S.Ct. 690. It seems likely that congressional enactment of the National Environmental Policy Act acts as an implicit proscription of such a private right of action.[47] Additionally, H. R. 14527 introduced in the House of Representatives in 1974 would amend FWCA so as explicitly to establish a private right of action. H.R. 14527, 93d Cong., 2d Sess. § 10 (1974). Although not conclusive evidence with respect to

the instant issue, H.R. 14527 does indicate that at least certain members of Congress believe that further legislation is necessary to create a private right of action under FWCA. The Court concludes that no private right of action arises under FWCA and, accordingly, the Court dismisses plaintiffs' third claim with prejudice.

## IV. NATIONAL ENVIRONMENTAL POLICY ACT OF 1969

Plaintiffs' fourth claim for relief alleges that the construction of the proposed Peripheral Canal and the proposed increases in the volume of water to be pumped at the Tracy and Delta Plants, together with any modifications thereto necessary to accommodate such increases will violate the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, unless adequate Environmental Impact Statements (EIS) are first prepared by the responsible federal agencies.

Section 2 of NEPA sets forth the congressional purposes of NEPA.[48] Section 101 of NEPA contains a congressional declaration of national environmental policy.[49] Section 102 of NEPA estab-

47. The courts have held that compliance with the National Environmental Policy Act will automatically satisfy the requirements of FWCA and that there will be no need separately to comply with FWCA. *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 356 (8th Cir. 1972). *See Environmental Defense Fund, Inc. v. Corps of Engineers, supra*, 325 F.Supp. at 754. *Cf. Cape Henry Bird Club v. Laird*, 359 F. Supp. 404, 417 (W.D.Va.1973), aff'd., 484 F.2d 453 (4th Cir. 1973). Any failure to comply with FWCA should be challenged in a suit attacking the adequacy of compliance with NEPA. *See Environmental Defense Fund, Inc. v. Corps of Engineers, supra*, 325 F.Supp. at 754. *Cf. Cape Henry Bird Club v. Laird, supra,* 359 F.Supp. at 418.

48. Section 2 states:
"The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate

the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U.S.C. § 4321.

49. Section 101 states:
"(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain condi-

lishes a mandatory procedure to compel consideration of and adherence to the newly enacted environmental policy by requiring the completion of an EIS be-fore major federal actions significantly affecting the quality of the human environment can be taken.[50] The EIS is significant in two major respects. Firstly,

tions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

"(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

"(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

"(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

"(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

"(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

"(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

"(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

"(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." 42 U.S.C. § 4331.

50. Section 102 states:
"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

"(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

"(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by sub-chapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

"(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

"(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

"(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring,

it requires federal agencies to review and assess the environmental effects of major actions they propose to undertake.[51] Secondly, it provides a ready source of information and evidence so that the public, Congress, and the courts can review those major federal actions significantly affecting the environment. Whether NEPA also creates substantive rights and whether courts will perform a substantive, as opposed to merely a procedural, review of an EIS is an unresolved question.[52] However, since there is not a final EIS on any aspect of the Peripheral Canal project before the Court, judgment is reserved on this question until a later day.

The Court must first determine whether the requirements of Section 102 apply to any of the three facilities which are the subject matter of this controversy.[53] There is no question that the operational effects of each of the three facilities will have significant effects on the environment. All of the parties to this suit are in agreement on this point.[54] The main issue is whether

there is major federal action present, thus requiring an EIS.

### A. The Peripheral Canal

With respect to the Peripheral Canal, major federal action can be derived from one or both of two bases. The first of these bases is participation by the Bureau of Reclamation in the construction, operation, or even planning of the Canal, and the second is the issuance of Section 9 and 10 permits authorizing the construction and operation of the Canal.

#### 1. Bureau of Reclamation Participation

If there is federal participation in the construction or operation of the Peripheral Canal, it is clear that either act will constitute major federal action necessitating compliance with NEPA. It is not clear, however, whether there is presently, or in the future will be, such federal participation. At the trial, evidence was adduced with respect to the extent of

---

maintaining, and enhancing the quality of the environment;

"(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

"(H) assist the Council on Environmental Quality established by subchapter II of this chapter." 42 U.S.C. § 4332.

51. See CEQ Guidelines § 1500.1(a).

52. *See Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123, 1138–1140 (5th Cir. 1974); *Sierra Club v. Froehlke*, 486 F.2d 946, 953 (7th Cir. 1973); *Conservation Council v. Froehlke*, 473 F.2d 664, 665 (4th Cir. 1973); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 470 F.2d 289, 300–301 (8th Cir. 1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973); *National Helium Corp. v. Morton*, 455 F.2d 650, 656 (10th Cir. 1971); *Calvert Cliffs' Coordinating Comm. v. AEC*, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971); *Environmental Defense Fund v. TVA*, 371 F.Supp. 1004, 1013 (E.D.Tenn.1973), *aff'd.*, 492 F.2d 466 (6th Cir. 1974); *Conservation Society v. Secretary of Transportation*, 362

F.Supp. 627, 632 (D.Vt.1973) (Oakes, J.), *aff'd.*, 508 F.2d 927 (2d Cir. 1974). *Cf. Daly v. Volpe*, 514 F.2d 1106, 1108–1109 (9th Cir. 1975); *Lathan v. Brinegar*, 506 F.2d 677, 692–693 (9th Cir. 1974) (*en banc*). *See also Note, The Least Adverse Alternative Approach to Substantive Review Under NEPA*, 88 Harv.L.Rev. 735 (1975); *Note, Substantive Review Under the National Environmental Policy Act: EDF v. Corps of Engineers*, 3 Ecol.L.Q. 173 (1973).

53. The Court notes that NEPA does not define the term "major federal actions significantly affecting the environment". The Council on Environmental Quality has, however, promulgated certain guidelines and regulations defining the term "actions", CEQ Guidelines § 1500.5, and identifying major actions significantly affecting the environment, CEQ Guidelines § 1500.6.

54. In the Agreed Pre-Trial Order, the parties stipulated that the Peripheral Canal was a " 'project' having a 'significant effect on the environment' " within the meaning of the California Environmental Quality Act. See Agreed Pre-Trial Order, § 3.44.

federal participation in the Peripheral Canal project.

In the early 1960s the Bureau of Reclamation was active in formulating development plans for the Peripheral Canal and in fact performed the bulk of this development work until 1968 when the Peripheral Canal Feasibility Report was completed. That report was accompanied by a recommendation from the Commissioner of the Bureau of Reclamation that the Secretary of the Interior adopt the report. Subsequently, on July 3, 1969, an Assistant Secretary of the Interior adopted and approved the report. That report proposed construction of the Peripheral Canal as a joint-use project of the federal and state governments to transfer water across the Delta. It discussed the need for such a facility, the basic engineering requirements, the benefits to be derived from its use, and set out a financial analysis of its cost. Additionally, the Feasibility Report proposed that the cost of the Canal be allocated on a 50–50 basis between the state and federal governments. Although the Feasibility Report has never been submitted to Congress, the Bureau of Reclamation has never given the Department of Water Resources any indication that the federal government would not participate in the financing of the construction of the Peripheral Canal nor has the Bureau of Reclamation withdrawn its recommendation which accompanied the Feasibility Report. Notwithstanding the nonexistence of a formal agreement between the state and federal governments *vis a vis* the construction and use of a Peripheral Canal, there existed a common understanding that the Canal would be a mutual undertaking of both the Department of Water Resources and the Bureau of Reclamation.[55] The personnel of those agencies meet periodically to discuss each other's needs with respect to the Peripheral Canal so that the Department of Water Resources can accommodate federal needs. In the absence of direct federal authorization or funding of the construction of the Peripheral Canal, it is quite possible that the state will enter into a wheeling contract [56] with the federal government, and such a contract could be tantamount to joint funding.[57]

55. The Director of the Department of Water Resources testified that he was proceeding on the assumption that the Peripheral Canal would be a joint-use facility of the state and federal governments.

56. A wheeling contract is merely an arrangement whereby the federal government would pay the state charges for the use of part of the Canal's capacity to transport federal water.

57. If there is a wheeling contract, the federal payments thereunder will flow into the State Water Project Funding Account. It is a plausible inference that any federal payments credited to the Funding Account would be used both to service the debt responsible for providing funds to construct the Peripheral Canal and to pay operation and construction expenses of the Canal. A wheeling contract could provide for short-term use of the Peripheral Canal by the Bureau of Reclamation while the federal government developed its own facility or made some alternative arrangements to meet its obligations with respect to supplying federal water to the Central Valley. Such an arrangement would not be equivalent to a joint funding of the Canal. However, if the contract provided for federal use of the Canal which approached the physical life of the Canal, and if the amount of the annual wheeling charge approached an amount representing the sum of those annual operation expenses allocable to federal use of the Canal and that amount necessary to repay the imputed federal share of the Canal's cost assuming ·an appropriate interest rate and amortization of that share of the cost over a given period of time (*i. e.*, either the physical life of the Canal or the life span of any securities used by the state to finance. the Canal), then such a wheeling contract might be equivalent to a joint funding of the Canal. As it has been recognized that lease arrangements are forms of financing, in the instant case a wheeling contract containing certain terms could be a form of financing. Accordingly, if the Bureau of Reclamation withdraws from the project and decides to utilize the Peripheral Canal by means of a wheeling contract, this Court will have to decide wheth-

**644**

On the record before the Court, then, it is not possible to determine whether the federal government will participate in either the construction or the operation of the Peripheral Canal.

 Even if the Bureau of Reclamation does not participate in the construction and operation of the Canal, its participation in the planning phase may constitute sufficient participation in the project to activate the NEPA requirements of an EIS. It is clear from the trial record that the Bureau of Reclamation is more than a mere neutral observer in the Peripheral Canal project. It was the moving force pushing forward the initial development plans, its recommendation of joint participation in the project was approved by the Secretary of the Interior,[58] and it has expended over $750,000 on the planning of the project. Although this expenditure of money alone may not constitute major federal action in light of the large cost of the entire project, it must be seen in connection with two other factors. As recommendations of this nature move up through the federal bureaucracy, they develop an irreversible momentum and result in the irretrievable commitment of resources, particularly in the form of planning and development funds. Bureaucrats develop vested interests in positions adopted at early stages, and it becomes more likely that an EIS prepared at the end of the bureaucratic chain will be nothing more than a post-hoc rationalization of prior development. See *Jones v. District of Columbia Redevelopment Land Agency*, 162 U.S.App. D.C. 366, 499 F.2d 502, 511 (1974). To allow a federal agency to provide all the impetus for planning and development of a project, to fund a portion of this development process although signifi-

cantly smaller than the funds expended by the state, and to lobby actively in support of that project, and not to require that agency to file an EIS could result in a subversion of the policies underlying NEPA. In view of the independent ground for an EIS in this case, however, discussed below, and because the Bureau of Reclamation's staff is presently preparing an EIS, the Court need not reach this issue.

2. *The Issuance of Section 9 and 10 Permits*

 The Court's holding that the construction and operation of the Peripheral Canal will require the defendants to comply with Sections 9 and 10 of the Rivers and Harbors Act of 1899 [59] provides the second basis of major federal action with respect to the Peripheral Canal. The issuance of either a Section 9 or 10 permit pursuant to the Rivers and Harbors Act of 1899 always constitutes major federal action and unless the Corps of Engineers or the Department of the Army makes the negative determination that the issuance has no significant effect on the environment, an EIS is required. See *Davis v. Morton*, 469 F.2d 593, 597–598 (10th Cir. 1972); *Citizens for Clear Air, Inc. v. Corps of Engineers*, 349 F.Supp. 696, 707–708 (S.D.N.Y.1972); *Kalur v. Resor*, 335 F.Supp. 1 (D.D.C.1971). *Cf. Scientists' Inst. for Public Information, Inc. v. AEC*, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973); CEQ Guidelines § 1500.5. It is irrelevant that the project may be neither federally financed nor constructed under the auspices of a federal agency. The key factor is that without federal approval (*i. e.*, in this case a federal permit) the project could not commence, and thus the federal action (*i. e.*, issuing the permit) has as

er the terms of that arrangement make it equivalent to a joint funding of the Canal or represent mere short-term use.

58. See Plaintiffs' Exhibit 14. On July 3, 1969, Assistant Secretary of the Interior

James R. Smith approved and adopted the Bureau's feasibility report on the Peripheral Canal.

59. See p. 632, *supra*.

much effect on the environment as federal funding would have. In *Scientists' Inst. for Public Information, Inc. v. AEC, supra,* 481 F.2d at 1091, the court went so far as to hold that *development of a new technology* by a federal agency which would permit private companies to construct facilities having a significant effect on the environment was by itself major federal action requiring compliance with NEPA's EIS requirement. Thus, before the Corps can issue Section 9 and 10 permits for the Peripheral Canal, an EIS must be filed.

■■■ Since the Corps of Engineers is taking major federal action by issuing the permits, normally it would be required to prepare an EIS. However, here where the Bureau of Reclamation has already begun preparation of an EIS, the Court will not require the Corps to duplicate the efforts of the Bureau of Reclamation as long as the Bureau completes preparation of the EIS prior to the issuance of Section 9 or 10 permits by the Corps.[60] Should the Bureau of Reclamation cease preparation of the EIS, then that obligation would devolve upon the Corps.

### B. *The Delta and Tracy Pumping Plants*

■■■ With respect to the Delta and Tracy Pumping Plants, it is convenient to distinguish the operation of these facilities up to their present maximum capacities from any future expansion of the two facilities. In regard to the former, plaintiffs vigorously assert that because total annual pumping at both structures will increase in future years to reach their present maximum capacities, these increases alone will be sufficient to require the filing of an EIS. The Court finds this assertion untenable. It is neither supported in logic nor by the case law. Although NEPA is applicable to further incremental major federal actions occurring subsequent to its effective date even though a project was initiated prior to that date, once a project is complete, there can be no further major action because at the time of completion, the project was capable of operating at maximum capacity and the agencies intended to operate it at full capacity. *See generally Morris v. TVA,* 345 F.Supp. 321, 324 (N.D.Ala.1972). See CEQ Guidelines § 1500.13. If NEPA were construed to require application to ongoing projects which were fully completed prior to January 1, 1970, most federal agencies would become trapped in an endless web of EIS paperwork. Such an interpretation was not intended by Congress and is not supported by the case law.[61]

■■■ Nonetheless, an EIS will be required in this case, because both the

---

**60.** In *Jones v. District of Columbia Redevelopment Land Agency, supra,* 499 F.2d at 511, the court held that where an urban renewal plan would be passed upon by three different federal agencies, NEPA required all three agencies to prepare an EIS. An EIS is expensive to prepare and to require both the Corps of Engineers and the Bureau of Reclamation to prepare an EIS on the same project would result in a duplication of effort and unnecessary duplicative expenditures of money. Although it could be argued that two EISes would paint a more balanced and objective picture of the environmental impact of the project, it seems unlikely that the incremental increase in objectivity due to the second EIS outweighs the cost of preparation of a second statement. The essence of *Jones* is not that every agency prepare an EIS, but rather that an EIS be prepared at that first point in the decision-making process where there is major imput by a federal agency. If the Bureau of Reclamation continued to participate in the Peripheral Canal project, then it would clearly be the more appropriate agency to prepare the EIS since it will be the first agency to shape the plans for the Peripheral Canal. In this fashion environmental considerations would enter into and affect the decision-making process at an earlier stage than if the EIS were prepared by the Corps.

**61.** The logic of plaintiffs' position would require all on-going projects to be assessed even though there may be no future major action otherwise to subject those projects to the EIS requirement. Such a result could

Tracy and Delta Plants were constructed and are now operated in violation of Section 10 of the Rivers and Harbors Act of 1899 and Section 10 permits must be obtained in order to continue their operations. In considering these applications, the Corps of Engineers and the Department of the Army should consider the advisability of setting operational limitations on export pumping by the two plants.[62] An agency which violates the law by failing to obtain the necessary permits in accordance with the Rivers and Harbors Act of 1899 proceeds at its own peril and must suffer the consequences of later having to obtain those permits when the standards for their issuance are more stringent. Because these permits will be issued after the effective date of NEPA, the issuing agencies will have to file an EIS prior to issuance, as the issuance of the permits will constitute major federal action significantly affecting the environment. When they comply with NEPA, the federal agencies may take into account the present existence of the Delta and Tracy Plants. In considering operation of those facilities, however, future operational decisions must be shaped so as to minimize adverse environmental consequences, and to the extent practicable they must comply with the EIS procedure. These Section 10 permits must be obtained not to validate the past unlawful construction and operation of these two facilities, but rather to insure that future operation is in accordance with the law.

 With respect to any future expansion of the Delta[63] or Tracy[64] plants, an EIS may be required. In the case of the Delta Plant, the state facility, if the Department of Water Resources installs the four additional pumps at the Delta Plant, as is presently planned, that agency will need to obtain a Section 10 permit prior to the commencement of installation and, consequently, the Corps of Engineers will be

---

be argued to be consistent with the objectives of NEPA in that, given the fixed cost of a totally completed project, where the benefits of shutting down the project outweighed all of the costs of the project, the project should be curtailed. However, plaintiffs' position is without support either in NEPA or in the cases construing it.

62. It may well be that after consideration of all environmental and other factors, the Corps will want to establish certain periods of the tidal cycle or year when pumping should be curtailed or should be continued at a lower rate. Another possible limitation might be the establishment of an objective test, based upon such factors as the amount of salinity in the Delta waters at various locations, which could be applied on a regular basis and which would set the operational limits.

63. The Department of Water Resources estimates future water transmission by the State Water Project through the Delta Plant will increase to 1,723,000 acre-feet by 1980, 3,579,000 acre-feet by 1990, and 4,353,000 acrefeet by 2020. The testimony was undisputed that the present maximum pumping capacity of the Delta Plant (6300 cfs) would have to be increased in order for the State to meet contractual obligations. Mr. Teerink, Direc-

tor of the Department of Water Resources, testified that the present maximum capacity was approximately ⅔ of the future contractual obligation. The present annual maximum pumping capacity of the Delta Plant is 4,599,000 acre-feet. This capacity is inconsistent with Mr. Teerink's testimony and would also seem to be inconsistent with any need to add four additional pumps to the Delta Plant in view of the Department's estimates of future water transmissions by the State Water Project.

64. The rate of export pumping of Delta waters by the Tracy and Delta Plants will increase from 3,388,000 acre-feet to approximately 7,000,000 acre-feet in 1990, and approximately 7,750,000 acre-feet by 2020. The figure for 1990 assumes the completion of all related federal and state projects, including the Peripheral Canal. It is expected that by 2020, the federal government will be exporting 4,087,000 acre-feet per annum through the Tracy Plant. In order to double approximately the federal export rate, either the Tracy Plant would have to be enlarged or a supplemental pumping facility would have to be constructed, as the present maximum capacity of the Tracy Plant is only 3,400,000 acre-feet per annum if all six units are available 365 days a year.

required to file an EIS if it determines that the expansion in capacity will have a significant effect on the environment. It will be no defense that the original project was initiated and completed prior to January 1, 1970, as any future expansion of pumping facilities and issuance of a Section 10 permit with respect thereto will constitute either future incremental major action of an ongoing project or new major federal action and may require an EIS before the agencies can proceed. See *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1282–1283 (9th Cir. 1973); *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323, 1331 (4th Cir. (1972); *Keith v. Volpe*, 352 F.Supp. 1324, 1332 (C.D.Cal.1972), *aff'd. sub nom. Keith v. California Highway Commission*, 506 F.2d 696 (9th Cir. 1974); *Morningside-Lenox Park Ass'n v. Volpe*, 334 F.Supp. 132, 144 (N.D.Ga.1971). No exemption from NEPA's requirements arises even if it were impractical to reassess the basic course of action of the original project. See *Jicarilla Apache Tribe of Indians v. Morton, supra*, 471 F.2d at 1282–1283. The agency required to file the EIS must still act so as to minimize any adverse environmental consequences of remaining portions of the project "to the maximum extent practicable". Where part of a project subject to the NEPA requirements has been constructed prior to the effective date of NEPA, then the cost of activity completed prior to the NEPA effective date is merely one additional factor to be weighed in applying cost-benefit analysis to determine the course of future incremental major actions subject to NEPA. Thus, in the case of a project where all major federal action is

post-NEPA, an EIS is required to the *fullest extent possible*, while where some major federal action occurred pre-NEPA, an EIS is required to the *maximum extent practicable* as to major federal actions taken after January 1, 1970. See *Jicarilla Apache Tribe of Indians v. Morton, supra*, 471 F.2d at 1282–1283; *Environmental Law Fund v. Volpe*, 340 F.Supp. 1328, 1332 (N.D.Cal.1972).

In the case of the Tracy Plant, the federal facility, if the Bureau of Reclamation attempts to expand its pumping capacity, both the expansion itself and the issuance of a Section 10 permit authorizing that expansion will require an EIS.[65]

## C. Timing of the EIS

 Finally, the timing of any required EIS for the three structures considered here merits some mention. Any EIS which is required because of the issuance of Section 9 and 10 permits should be drafted and completed well in advance of the commencement of the Corps' decision-making process. See *Greene County Planning Board v. FPC, supra*, 455 F.2d at 421–422. Although we do not set forth explicit requirements with respect to the timing of the EIS by the instant agencies, they should be guided by the statement of the court in *Jones v. District of Columbia Redevelopment Land Agency, supra*, that EISes

"were not to be merely *post hoc* environmental rationalizations of decisions already fully and finally made. Rather their purpose is to ensure 'meaningful consideration of environmental factors at all stages of agency decision making,' and to inform both the public and agencies implicated at subsequent

---

65. Here the expansion of the capacity at the Tracy Plant would constitute major federal action and the responsible federal official would be associated with the Bureau of Reclamation. The action of the Secretary of the Army (or the Corps) with respect to the issuance of the Section 10 permit would not require him to prepare an EIS since its scope would be identical to that prepared by the Bureau of Reclamation. See p. 645, *supra.* In contrast the major federal action involved with the expansion of the capacity of the Delta Plant would be the issuance of the Section 10 permit and the responsible federal official, the Secretary of the Army (or the Corps), would have to prepare an EIS.

stages of decision-making of environmental costs of the proposal." 499 F. 2d at 511.

This statement also applies to the timing of any EIS that must be filed on the part of the Bureau of Reclamation due to its participation in the Peripheral Canal project. It is clear beyond cavil that an EIS would be required considerably prior to the first day of construction activity.[66] *Cf. Environmental Law Fund v. Volpe, supra,* 340 F.Supp. at 1332–1333; *Morningside-Lenox Park Ass'n v. Volpe, supra,* 334 F.Supp. at 142–144.

## V. CALIFORNIA ENVIRONMENTAL QUALITY ACT

 Plaintiffs' sixth claim for relief alleges that the construction of the proposed Peripheral Canal, the proposed future increases in the volume of water to be pumped through the Delta and Tracy Plants, and the proposed modifications to the Delta Plant necessary to accommodate such increases will violate the California Environmental Quality Act (CEQA),[67] unless adequate environmental impact reports (EIR) are first prepared by the responsible state agency.[68]

66. At the outset of the trial, and in the initial briefs and memoranda filed with this Court, defendants asserted that the law imposed no duties presently as to the Peripheral Canal because its construction was not imminent. It was even contended that the likelihood of its being constructed at all was highly speculative. During trial, however, the parties abandoned that position, as the evidence proved that not only was the construction of the Canal imminent but that many activities certainly preparatory to the construction (if not construction itself) had been going on for some time. The Director of Water Resources, Mr. Teerink, stated that the state would build the Canal and was planning to commence construction late in 1975. He estimated completion by 1980. In order to meet that schedule, preconstruction activity (*e. g.,* right of way work, engineering studies) was presently underway.

The Department of Water Resources has officially adopted the Peripheral Canal as the Delta water facility of the State Water Project. Development and planning of the Peripheral Canal began at some point prior to 1965 and proceeded up to the date of the trial. This development work included the acquisition of land as a portion of the right of way, the initial design work, and commencement of the final design work including the preparation of contract drawings and construction specifications. In this connection, the state had expended through 1973 in excess of $6,627,000 on planning and development and in excess of $2,275,000 in connection with right-of-way acquisitions and the purchase of land. Furthermore, the federal government had spent over $750,000 through March 31, 1974, on activities associated with the planning of the Canal. At present the Department of Water Resources has approximately 45–50 people involved with the design group

working on the plans for the Canal. Finally, on January 18, 1968, the California Department of Public Works Division of Highways and the Department of Water Resources executed an agreement whereby the Department of Public Works would advance $2,000,000 to the Department of Water Resources so that it could acquire right of way for four segments of the Peripheral Canal sufficient to provide up to 7,000,000 cubic yards of borrow material from the canal prism. Pursuant to this agreement, contractors' bidding on the construction of Interstate 5 (I–5) would then be required to use those portions of the Peripheral Canal right of way as a mandatory borrow site for highway fill. The purpose of this agreement was to coordinate the construction of I–5 and the Peripheral Canal. Although I–5 bids were received in December of 1973, none had been accepted as of the date of the trial.

In *Friends of Earth v. Coleman,* 513 F.2d 295, 300 (9th Cir. 1975), the court held that the proposed I–5 excavations out of the proposed Peripheral Canal right of way would not constitute a commencement of the Canal project sufficiently significant to warrant formal NEPA evaluation of the Canal's environmental impact. The court did state that "an EIS will be required before any work on the canal beyond highway fill excavations can be done." *Ibid.* at 300.

67. California Public Resources Code, § 21000 *et seq.*

68. State defendants' assertion that the CEQA claim is barred by Section 21167(a) is without merit. That section provides:

"Any action or proceeding to attack, review, set aside, void, or annul the following acts or decisions of a public agency on the

Sections 21000 and 21001 of CEQA contain a declaration of California's general environmental policy. Section 21100 requires that state agencies prepare an environmental impact report on any project they propose to carry out or approve which may have a significant effect on the environment.[69] "Project" is defined in Section 21065.[70] Section 15081 of the CEQA regulations sets forth the factors to be weighed by an agency to determine whether a particular project is such that it "may have a significant effect on the environment".[71]

grounds of noncompliance with this division shall be commenced as follows:

"(a) An action or proceeding alleging that a public agency is carrying out or has approved a project which may have a significant effect on the environment without having determined whether the project may have a significant effect on the environment shall be commenced within 180 days of the public agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days after commencement of the project." The amendment adding the CEQA claim related back to the filing of the complaint as the CEQA claim arose out of the same transaction and involves the same defendants. Fed.R.Civ.P. 15(c).

69. Section 21100 provides:

"All state agencies, boards, and commissions shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they propose to carry out or approve which may have a significant effect on the environment. Such a report shall include a detailed statement setting forth the following:

"(a) The environmental impact of the proposed action.

"(b) Any adverse environmental effects which cannot be avoided if the proposal is implemented.

"(c) Mitigation measures proposed to minimize the impact including, but not limited to, measures to reduce wasteful, inefficient, and unnecessary consumption of energy.

"(d) Alternatives to the proposed action.

"(e) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

"(f) Any irreversible environmental changes which would be involved in the proposed action should it be implemented.

"(g) The growth-inducing impact of · the proposed action."

70. Section 21065 provides:

" 'Project' means the following:

"(a) Activities directly undertaken by any public agency.

"(b) Activities undertaken by a person which are supported in whole or in part through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.

"(c) Activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

71. Section 15081 provides in pertinent part:

"(a) The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data. An iron clad definition of significant effect is not possible because the significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may be significant in a rural area. There may be a difference of opinion on whether a particular effect should be considered adverse or beneficial, but where there is, or anticipated to be, a substantial body of opinion that considers or will consider the effect to be adverse, the lead agency should prepare an EIR to explore the environmental effects involved.

"(b) In evaluating the significance of the environmental effect of a project, the lead agency shall consider both primary or direct and secondary or indirect consequences. Primary consequences are immediately related to the project (the construction of a new treatment plant may facilitate population growth in a particular area), while secondary consequences are related more to primary consequences than to the project itself (an impact upon the resource base, including land, air, water and energy use of the area in question may result from the population growth).

"(c) Some examples of consequences which may have a significant effect on the environment in connection with most projects where they occur, include a change that:

"(1) Is in conflict with environmental plans and goals that have been adopted by the community where the project is to be located;

The California Supreme Court has noted the similarity of CEQA and NEPA and stated that interpretations of NEPA are relevant in construing similar terms in CEQA. *Friends of Mammoth v. Board of Supervisors of Mono County,* 8 Cal.3d 247, 104 Cal.Rptr. 761, 502 P.2d 1049, 1058 (1972). One federal court has held that CEQA was deliberately modeled after NEPA and that therefore the same considerations govern the applicability of the two acts to the same projects. *Keith v. Volpe, supra,* 352 F.Supp. at 1337. Accordingly, most of the principles discussed *supra* with regard to NEPA are applicable to our consideration of the duties imposed upon defendants with respect to CEQA.

In the Agreed Pre-Trial Order the defendants stipulated that the Peripheral Canal was a project which may have a significant effect on the environment.[72] In fact, the state defendants issued a draft Environmental Impact Report on the Peripheral Canal project in August of 1974. That draft is being circulated for comments and criticism, and then a final Environmental Impact Report will be prepared. In view of the imminence of this report the Court will offer only a few observations.

■■■ At present no Environmental Impact Report is required with respect to the Delta Plant as that facility was completed prior to the effective date of CEQA. Before expanding that facility by installing additional pumps, however, the state defendants will have to comply with CEQA.[73] There is no merit to plaintiffs' contention that increased pumping by the presently existing facility requires compliance with CEQA. Plaintiffs' reliance on *County of Inyo v. Yorty,* 32 Cal.App.3d 795, 108 Cal.Rptr. 377 (1973), is misplaced as in that case there was construction of additional pumping and extraction facilities in addition to expanded pumping at presently existing facilities. Finally, no Environmental Impact Report will be required for the Tracy Plant since that is a federal facility and thus not subject to CEQA.

"(2) Has a substantial and demonstrable negative aesthetic effect;

"(3) Substantially affects a rare or endangered species of animal or plant, or habitat of such a species;

"(4) Causes substantial interference with the movement of any resident or migratory fish or wildlife species;

"(5) Breaches any published national, state, or local standards relating to solid waste or litter control;

"(6) Results in a substantial detrimental effect on air or water quality, or on ambient noise levels for adjoining areas;

"(7) Involves the possibility of contaminating a public water supply system or adversely affecting ground water;

"(8) Could cause substantial flooding, erosion or siltation;

"(9) Could expose people or structure to major geologic hazards." 14 Cal.Admin. Code, § 15081.

72. See Agreed Pre-Trial Order, § 3.44.

73. See 14 Cal.Admin.Code, § 15070, which provides in pertinent part:

"(a) A project as defined in Section 15037 (a)(1) of these Guidelines, approved prior to November 23, 1970, shall require an Environmental Impact Report or a Negative Declaration if the project may have a significant effect on the environment, and either of the following conditions exists:

"(1) A substantial portion of public funds allocated for the project have not been spent and it is still feasible to modify the project to mitigate potentially adverse environmental effects, or to choose feasible alternatives to the project, including the alternative of 'no project' or halting the project; provided that this Section (1) shall not apply to projects which come under the jurisdiction of the National Environmental Policy Act (NEPA) and which, through regulations promulgated under NEPA, were held to be too far advanced at the time of NEPA's effective date to require an EIS in compliance with those regulations.

"(2) A public agency proposes to modify the project in such a way that the project might have a new significant effect on the environment."

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law as required by Rule 52(a) Federal Rules of Civil Procedure.

It is hereby ordered that the state defendants shall obtain authorization to operate the Delta Pumping Plant in the manner prescribed in Section 10 of the Rivers and Harbors Act of 1899, 33 U. S.C. § 403, by the date established by this Court at the hearing to be held on September 4, 1975, as more fully set forth below.

It is hereby further ordered that the federal defendants shall obtain authorization to operate the Tracy Pumping Plant in the manner prescribed in Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, by the date established by this Court at the hearing to be held on September 4, 1975, as more fully set forth below.

It is hereby further ordered that the Secretary of the Army or his delegate shall prepare and file an Environmental Impact Statement pursuant to 42 U.S.C. § 4332 with respect to issuance of any Section 10 permits authorizing the operation of the Tracy Pumping Plant and the Delta Pumping Plant prior to the issuance of any such permits.[74]

It is hereby further ordered that all parties shall appear before this Court at 1:30 P.M. on September 4, 1975, in order to determine a date by which the state and federal defendants must obtain authorization of the operation of the Tracy and Delta Pumping Plants under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403.

It is hereby further ordered that with respect to the Peripheral Canal, as presently proposed, no construction work shall begin prior to the receipt of authorization under Sections 9 and 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401, 403, and that no Section 9 or 10 permits may be issued with respect to the Peripheral Canal, as presently proposed, without the prior preparation and filing of an Environmental Impact Statement by the Secretary of the Army or his delegate pursuant to 42 U.S.C. § 4332. If the Bureau of Reclamation completes preparation of an Environmental Impact Statement with respect to the Peripheral Canal, then that report may be filed in lieu of the Environmental Impact Statement required by this order with respect to the Canal and that filing will obviate the need for such a filing by the Secretary of the Army.

It is hereby further ordered that with respect to the Peripheral Canal, as presently proposed, no construction work shall commence until the Department of Water Resources prepares and files an Environmental Impact Report pursuant to California Public Resources Code § 21100.[75]

It is hereby further ordered that plaintiffs' second, third and fifth claims are dismissed with prejudice.

---

74. Nothing in this order shall be construed to prohibit the federal defendants from preparing and filing one document to serve as an Environmental Impact Statement for the Tracy Pumping Plant, the Delta Pumping Plant, and the Peripheral Canal as long as any such document meets the requirements of 42 U.S.C. § 4332, and as long as legally imposed deadlines are met.

75. Nothing in this Memorandum of Opinion shall be construed to prohibit the defendants from preparing one document to serve as both the Environmental Impact Statement and Environmental Impact Report as long as that one document meets the requirements of both 42 U.S.C. § 4332 and California Public Resources Code § 21100. Nor should anything in this Memorandum of Opinion be construed to preclude any consolidation of the work effort on the part of defendants in the preparation of the necessary Environmental Impact Statement and Environmental Impact Report to the extent that such a consolidation would result in avoidance of repetitious work by defendants.

652

SACRAMENTO-SAN JOAQUIN DELTA

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION

CENTRAL VALLEY PROJECT
DELTA DIVISION - CALIF.

PERIPHERAL CANAL UNIT
1155-208-24

PLATE 15

FEBRUARY 1968

EXHIBIT A